Tonya **DWIGHT**, Appellant,

v.

**HUMANA HOSPITAL ALASKA, Travelers Indemnity Co., and the Alaska Workers' Compensation Board, Appellees.**

No. S–5635.

Supreme Court of Alaska.

July 8, 1994.

William J. Soule, Law Office of William J. Soule, Anchorage, for appellant.

Monica Jenicek, Stone, Waller & Jenicek, Anchorage, for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, Justice pro tem.*

## OPINION

COMPTON, Justice.

This case involves the Alaska Workers' Compensation Board's determination that an injured employee (1) was not entitled to disability benefits because she had not proved by a preponderance of the evidence that her injury was compensable, and (2) had waived her right to a second independent medical evaluation under AS 23.30.095(k). The superior court affirmed the Board's decision, and the employee appeals. We affirm the superior court's decision that the employer effectively rebutted the presumption of compensability. We reverse and remand the superior court's decision that the employee had waived her right to an independent medical evaluation.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

Tonya Dwight became employed as a secretary/clerk at Humana Hospital Alaska (Humana[1]) in 1981. While working in the radiology department, she was exposed to Staphene, a "chemical disinfectant spray and air sanitizer" that is commonly used in medical environments and was used daily at Humana Hospital. She filed a claim following her most recent untoward incident of exposure in December 1988. Dwight has not returned to work at Humana since that time. She alleges that she has become hypersensitive to cleaners and other chemicals.

In deciding this case, the Alaska Workers' Compensation Board (Board) considered the December 1988 exposure as well as three prior incidents of exposure resulting in illness.

A. The First Exposure—April 1987.

On April 17, 1987,[2] a hospital worker used Staphene to cleanse the air of cigarette

---

*\* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.*

1. Where appropriate, "Humana" refers to both Humana Hospital and its workers' compensation insurance carrier, Travelers Indemnity Co.

2. This incident occurred six years after Dwight began working at Humana. Dwight had previously had "frequent exposure" to Staphene without problems.

smoke in a hospital lounge. Dwight complained of numbness and tingling in her mouth, lips and tongue. She called the emergency room (E.R.) and was told to take Benadryl, which she did. However, she did not seek medical attention until April 20–21, when she presented to the E.R. at Humana with hives. The treating physicians concluded that Dwight was experiencing an allergic reaction to Keflex, a drug which she had been taking for a sinus infection.[3]

### B. The Second Exposure—November 1987.

On November 2, 1987, a janitor used Staphene when cleaning up vomit at the hospital. Dwight complained of chest tightness, shortness of breath, wheezing and a hoarse voice. She sought medical attention the next day. Her family doctor, Mary Ann Foland, M.D., did not find anything wrong with Dwight's ears, nose, throat or chest, nor did she find hives. Dr. Foland concluded that the illness was a "probable allergy to Staphene." Dwight was sporadically absent from work for two weeks.

On November 16, Dwight complained of bronchitis. She consulted James T. Scully, M.D., who found some evidence of bronchitis, but suggested that Dwight gradually return to work within two weeks. Dr. Scully indicated a possible link between the illness and exposure to Staphene.

### C. The Third Exposure—April 1988.

On March 31, 1988, Dwight was exposed to Staphene which had adhered to her supervisor's clothing. She complained of shortness of breath, swelling of her face, tongue, throat and joints, as well as bronchitis. She did not complain of hives. Dwight did not seek medical attention at the time. On April 5, Dwight saw Dr. Scully, who found her ears, nose and throat to be clear. He did not note any swelling of the face.

In October 1988 Dwight was transferred from radiology to the accounting department, a non-medical area of the hospital, in an attempt to avoid Staphene exposure.

### D. The Fourth Exposure—December 1988.

On December 5, 1988, Dwight was exposed to Staphene which was used as an air freshener in a bathroom at the hospital. She complained of wheezing, a rash and swelling of her hands and feet. She presented to the E.R. that day. The attending physician indicated that her symptoms were possibly the result of an allergic reaction to Staphene. This is the most recent incident of exposure.

On December 6 Dwight consulted Dr. Scully. He found that she had suffered an allergic reaction, but that her rash had cleared up and she could return to work on December 8. On December 7 Dwight consulted Dr. Foland, who also found that Dwight had a clear chest and no rash, and that Dwight could return to work within two weeks.

### E. Post–Exposure Examinations.

Dwight has since consulted Buffington B. Burtis, M.D., who concluded that Dwight's four illnesses indicated a hypersensitivity to Staphene that was life-threatening and completely disabling.

Abba I. Terr, M.D., examined Dwight at Humana's request. Dr. Terr concluded that Dwight's April 1987 illness was caused by an allergic reaction to Keflex. He concluded that Dwight's subsequent illnesses were not caused by Staphene exposure, but were anxiety-related.

### F. Proceedings Before the Board.

After Dwight's fourth exposure to Staphene, she reported the illness to Humana. It began paying her medical benefits and temporary total disability (TTD) benefits. Shortly thereafter, Humana terminated the TTD benefits, noting that Dwight's disability

---

3. David Williams, M.D., had prescribed the Keflex on April 13. There is no indication that Dwight was taking Keflex at any other time relevant to this case.

Dwight filed an occurrence report alleging that her symptoms had been caused by exposure to Staphene at work. Humana controverted the claim based on the opinion of Dr. David Williams, that Dwight had mistakenly attributed her allergic reaction to Keflex to her exposure to Staphene.

had ended on January 1, 1989. Based on a note from Dr. Foland, Humana reinstated TTD benefits. However, Humana controverted the TTD benefits as of January 18 [4] based on Dr. Foland's opinion that Dwight was medically stable and its belief that Dwight could work where there was no Staphene present.

Dwight adjusted her claim to include TTD or PTD (permanent total disability) payments from January 19, attorney's fees, costs and interest. Dwight did not request a second independent medical evaluation (SIME) under AS 23.30.095(k) at this time. The Board conducted a hearing in September 1990. Shortly thereafter, Dwight sought to admit affidavits of two co-workers. Humana objected.

The Board's Decision and Order of October 31, 1990 noted that although Dwight had demonstrated a preliminary link between her illnesses and job-related exposures to Staphene, Humana had shown substantial evidence to overcome the presumption of compensability. The Board concluded that the first reaction was an allergic reaction to Keflex, and that the other reactions were not anaphylactic reactions to Staphene. Because Dwight could not prove by a preponderance of the evidence that her illnesses were work-related, the Board dismissed the claim.[5]

Dwight petitioned the Board for rehearing and modification based on new evidence: two physicians' opinions that Dwight's illnesses were work-related. Dwight later amended her petition to include the Board's failure to conduct a SIME as required by AS 23.30.-095(k).

Dwight also appealed to the superior court, Alaska R.App.P. 210(e), arguing that the Board erred by not admitting the supplemental affidavits of the co-workers. Dwight voluntarily stayed this appeal pending her above petition for rehearing and modification.

The Board's Decision and Order of April 10, 1992 denied the motion for rehearing as untimely, refused to hear the new evidence, and held that Dwight had waived her right to assert a violation of AS 23.30.095(k). Dwight appealed this decision to the superior court.

### G. Proceedings in the Superior Court.

Both of Dwight's appeals were consolidated in the superior court, which affirmed the Board. The superior court concluded that the Board had not erred in refusing to rehear the case. It specifically concluded that Dwight had waived any claim based on AS 23.30.095(k). Dwight appeals. AS 22.05.010; AS 23.30.125.

## II. DISCUSSION

### A. AS 23.30.120(a)—The Presumption of Compensability.

Alaska Statute 23.30.120(a) provides in part:

**Presumptions.** (a) In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that

(1) the claim comes within the provisions of this chapter....

The Board found that although Dwight had established a preliminary link between her illness and her employment, Humana overcame the presumption of compensability. See *Veco, Inc. v. Wolfer*, 693 P.2d 865, 872 (Alaska 1985). Dwight argues that there was insufficient evidence to overcome the presumption under this court's decision in *Grainger v. Alaska Workers' Compensation Board*, 805 P.2d 976 (Alaska 1991). In *Grainger*, we held that to overcome the presumption of compensability, an employer

---

4. Humana continued to pay TTD benefits from 2/3/89 to 11/23/89 under a "Reservation of Right."

5. Dwight correctly notes that the Board based its conclusion in part on *Keyes v. Reeve Aleutian Airways*, No. 85–0132 (Alaska Workers' Compen-

sation Board November 8, 1985), which this court overruled in *Olson v. AIC/Martin J.V.*, 818 P.2d 669 (Alaska 1991). However, a second independent basis for the Board's decision was the conclusion that Humana rebutted the presumption of compensability. This second conclusion is undisturbed by *Olson*.

must present substantial evidence [6] that either

(1) provides an alternative explanation which, if accepted, would exclude work-related factors as a substantial cause of the disability; or (2) directly eliminates any reasonable possibility that employment was a factor in causing the disability.

*Id.* at 977. We will not affirm a Board decision where we " 'cannot conscientiously find that the evidence supporting the decision is substantial.' " *Id.* at 979 (quoting *Delaney v. Alaska Airlines,* 693 P.2d 859, 864 n. 2 (Alaska 1985)); see also *Black v. Universal Servs., Inc.,* 627 P.2d 1073, 1076 (Alaska 1981) ("While the judiciary may not reweigh the evidence before the Board, neither may it abdicate its reviewing function and affirm a Board decision that has only extremely slight supporting evidence.") (citation omitted).

Humana points to the "numerous factors" cited by the Board as substantial evidence rebutting the presumption of compensability: (1) evidence that Dwight's April 1987 illness was the result of an allergic reaction to Keflex; (2) Dr. Williams' opinion that Dwight may have mistaken her Keflex allergy for a Staphene allergy; (3) Dwight's delays in seeking medical attention for "life-threatening" anaphylactoid reactions; (4) the opinion of Dr. Hemry, an allergy specialist, who was "not convinced" that Dwight's illnesses were caused by Staphene exposure; (5) a determination that Dr. Terr was more qualified than Dr. Burtis; (6) a determination that Dr. Terr's procedure in this case was more accurate and accepted than that of Dr. Burtis; (7) Dr. Terr's opinion that if Dwight were allergic to often-used Staphene, it is unlikely that she would suffer only four reactions in ten years of employment; and (8) the fact that the Board was presented with more than Dr. Terr's opinion: the treatment and evaluation records of *six* specialists other than Drs. Burtis and Terr, as well as Dwight's family physician and certain E.R. physicians.

■ Dwight responds that the evidence upon which the Board relied was not substantial for the following reasons: [7] (1) only Dr. Terr's opinion conclusively negated the possibility of Staphene exposure; (2) Dr. Terr's opinion did not present a likely alternative; [8] (3) there was no evidence that Dwight ingested Keflex at any time after December 1988; (4) the Board overstated Dr. Hemry's opinion that Dwight's illness was not caused by Staphene; (5) Dwight suffered symptoms in April 1987 that were inconsistent with an allergic reaction to Keflex, thereby suggesting that she was also suffering from exposure to Staphene; (6) Dr. Williams noted the possibility of an allergy to Staphene in relation to the April 1987 exposure; (7) the Board found certain delays on Dwight's part in seeking treatment to be inconsistent with an anaphylactoid reaction to Staphene, but Humana did not present evidence showing that Staphene exposure necessarily resulted in anaphylactoid reactions; (8) the Board ignored Dr. Burtis' opinion that the illnesses were caused by exposure to Staphene notwithstanding her ten years' work in the hospital environment where Staphene was regularly used; (9) there was evidence that Dwight did not have a mental disorder or anxiety; and (10) the Board focused on Staphene exposures *prior*

---

6. *See* AS 23.30.120(a). We independently review evidence to determine if it was "substantial." *Grainger,* 805 P.2d at 977 n. 1. Furthermore, we define "substantial evidence" as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Fireman's Fund Am. Ins. Cos. v. Gomes,* 544 P.2d 1013, 1015 (Alaska 1976) (quoting *Thornton v. Alaska Workmen's Compensation Board,* 411 P.2d 209, 210 (Alaska 1966)).

Moreover, because the superior court acted as an intermediate appellate court, we do not give deference to its decision. *National Bank of Alaska v. State, Dep't of Revenue,* 642 P.2d 811, 816 (Alaska 1982).

7. Dwight argues that "[a]ny doubts as to the medical evidence must be resolved in employee's favor." This is incorrect. In *Kessick v. Alyeska Pipeline Service Co.,* 617 P.2d 755 (Alaska 1980), we decided that *"in the absence of any competent contradictory medical evidence ... inconclusive medical testimony is to be resolved in favor of the claimant." Id.* at 757 n. 3, 758. Where, as here, there is contradicting medical evidence, there is no need to resolve ambiguity in Dwight's favor.

8. Dr. Terr concluded that Keflex caused the first reaction and hinted that the others were anxiety-related. He did not make a conclusion as to an alternative cause of the other exposures.

to that of December 1988, which was the exposure at issue.

■ We hold that Humana presented substantial evidence in support of its position on the issue of compensability, i.e., evidence that a reasonable mind might accept as adequate to support the conclusion that Dwight's illnesses were not work-related. *See Grainger*, 805 P.2d at 977 n. 1.. Accordingly, the Board properly concluded that Humana had rebutted the presumption of compensability.

B. AS 23.30.095(k)—The Second Independent Medical Evaluation.

Alaska Statute 23.30.095(k) provides in part:

*In the event of a medical dispute* regarding determinations of causation, medical stability, ability to enter a reemployment plan, degree of impairment, functional capacity, the amount and efficacy of the continuance or necessity of treatment, or compensability *between the employee's attending physician and the employer's independent medical evaluation,* a second independent medical evaluation *shall be conducted* by a physician or physicians selected by the board from a list established and maintained by the board. The cost of the examination and medical report shall be paid by the employer....

(Emphasis added). At the time of the September 1990 hearing there was a conflict between Dr. Burtis' opinion that Dwight "has a very severe hypersensitivity to the ingredients of Staphene ... [and] should not return to work," on the one hand, and Dr. Terr's opinion that Dwight's illnesses resulted from anxiety and an allergy to Keflex, both of which were unrelated to her employment at Humana, on the other.

Dwight argues that because there was such a "medical dispute" the Board was required to *order* a SIME, or in the alternative, was required to *inform* Dwight of her right to a SIME. She bases this claim on the mandatory language of section 095(k). Humana responds that the Board was not re-

quired to order the SIME unless either of the parties requested it. In this case they did not do so, thereby waiving their right to a SIME.

■ At the outset, we reject Humana's argument. The statute plainly does not provide that only the parties may *request* the SIME. We also reject Dwight's argument that the Board was required to *order* a SIME. The superior court correctly opined that it was not the legislature's intent to require a SIME every time the Board was presented with conflicting evidence:

The meaning urged upon this Court by [Dwight] would require the Board to appoint a physician at the expense of the employer every time there was disagreement in the evidence with regard to any of the issues set forth in [AS 23.30.095(k)]. According to [Dwight], this is mandated without regard to the Board's opinion as to its desirability or necessity, or any other attendant circumstance.

That such exams are expensive is well understood. That this economic burden was intended by the legislature to be automatically passed to the private sector and the ultimate consumer of goods and services [via the employer] when such exam is unnecessary to the proper performance of the Board's responsibilities seems more than doubtful.

*Some* dispute—in the general sense—will usually exist between an employer's physician and an employee's physician in any workers' compensation case that is contested before the Board. There is no evidence that the legislature intended that a SIME occur in *every* such case.

■ Nonetheless, we agree with Dwight's alternative "record waiver" argument. We hold that (1) in every case the Board is required to give the parties notice of their right to request and obtain a SIME under AS 23.30.095(k) in the event of a medical dispute[9]; (2) if a party requests a SIME the Board must order a SIME; and (3) in

9. At this time, each party can either request the SIME or enter into the record a clear waiver of the right to a SIME.

the event of a medical dispute, the Board on its own can order a SIME.

This "record waiver" interpretation contains a "gatekeeper" device; not every instance of dispute will prompt a SIME. This addresses the efficiency and economy concerns expressed by the Board and superior court in this case. The Board can acknowledge that there is conflict in the medical evidence, yet decline to order a SIME. However, it must inform the parties of such action and honor the parties' requests for a SIME.[10]

Furthermore, this interpretation is consistent with our decision in *Richard v. Fireman's Fund Insurance Co.*, 384 P.2d 445, 449 (Alaska 1963): "[A] workmen's compensation board ... owes to every applicant for compensation the duty of fully advising him as to all the real facts which bear upon his condition and his right to compensation, ... and of instructing him on how to pursue that right under the law."

 Humana argues that even if the Board should have informed the parties of their right to a SIME, its failure to do so was harmless error. We disagree. The Board's error was a violation of a statutory duty mandatory in form. We cannot say with confidence that if the statutory command had been followed the Board's decision would not have been different. *See Love v. State*, 457 P.2d 622, 631 (Alaska 1969); *Howarth v. Pfeifer*, 423 P.2d 680, 684 (Alaska 1967).

Dwight has thus persuaded us that the Board's failure to inform her of her right to a SIME deprived her of "the opportunity to have an impartial evaluator review the avail-

able medical records, perform additional diagnostics if medically indicated, and physically examine [her] to either corroborate or weaken the respective opinions of the disagreeing doctors." The unpredictable outcome of this examination is immaterial. Given the equivocal evidence from the E.R.s and treating physicians, the SIME could have influenced (1) the Board's decision in this case (i.e., that Humana had overcome the presumption of compensability), (2) Humana's continuing denial of the claim, or (3) Dwight's pursuit of the claim. Humana has not persuaded us otherwise. Accordingly, we reverse the decisions of the Board and superior court.

C. The Board's Refusal to Modify its Decision.

 Dwight petitioned for rehearing and modification of the Board's October 1990 decision based on new evidence pursuant to AS 23.30.130(a).[11] Because we remand this case, the rehearing issue is rendered moot.

### III. *CONCLUSION*

We hold that Humana rebutted by substantial evidence the presumption of compensability created by AS 23.30.120(a). However, the Board erred in not ordering a second independent medical examination or informing Dwight of her right to such an examination pursuant to AS 23.30.095(k). Accordingly, we AFFIRM in part and REVERSE and REMAND in part for proceedings consistent with this opinion.

---

10. Because the SIME is independent, both parties face the risk of receiving an unfavorable report. There is little incentive for overuse of the SIME because employees must submit to the examination and employers must pay for the examination.

At oral argument in this case, Dwight's counsel advised the court that the Board has recently amended its forms to advise parties of their right to a SIME, directing them to request or waive the SIME. This revised form does not appear in the record.

11. AS 23.30.130(a) provides in part:
[u]pon the application of any party in interest *on the ground of a change in conditions*, ... the

board may ... review a compensation case.... [T]he board may issue a new compensation order which terminates, continues, reinstates, increases, or decreases the compensation, or award compensation.

We review requests for modification under AS 23.30.130 per the substantial evidence standard. *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 169–70 (Alaska 1974). Nonetheless, we caution that "a reopening will not be permitted only to let one contestant cumulate more evidence on his side of a dispute." 3 Arthur Larson, *The Law of Workmen's Compensation* § 81.52(b), 15–1150 to 1151 (1992) (footnote omitted).