**MUNICIPALITY OF ANCHORAGE,
and Ward North America, Inc.,
Appellants,**

v.

**Samuel DEVON, Appellee.**

No. S–11368.

Supreme Court of Alaska.

Dec. 2, 2005.

Trena L. Heikes, Law Office of Trena L. Heikes, Anchorage, for Appellants.

Robert A. Rehbock, Rehbock & Rehbock, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The main question presented in this appeal is whether the Alaska Workers' Compensation Board erred in denying the Municipality of Anchorage's petition for reimbursement of workers' compensation benefits paid to Samuel Devon. The municipality argues on appeal that: (1) the board lacked substantial evidence to dismiss its petition in light of surveillance tapes showing Devon engaging in activities allegedly at odds with his claims of injury, and (2) the board erred in admitting certain medical records without allowing an opportunity for cross-examination. Because the testimony of one of Devon's treating physicians provided substantial evidence for the board to conclude that Devon did not misrepresent his condition in a way that garnered him increased benefits, and because

the superior court correctly concluded that any error associated with admission of the medical records was harmless, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Samuel Devon began working for the Municipality of Anchorage in May 1993 and was employed as a refuse disposal technician. While employed by the municipality, Devon sustained four injuries: (1) on February 1, 1995 he reported neck pain from having to continuously look over his right shoulder while operating a bulldozer; (2) on April 25,1998 he injured his neck and upper spine after a sixteen-foot fall; (3) on October 19, 1999 he suffered pain in his neck after hitting three raised manholes while operating a grader; and (4) on January 20, 2001 he reported severe neck pain stemming from the vibration associated with operating a grader. After the 1998 fall, Devon had two surgeries: in June 1998 he had his C6 and C7 vertebrae surgically fused and in November of that year he had arthroscopic surgery on his right shoulder to remedy various problems, including a SLAP lesion, which is a tear in the cartilage of the shoulder joint.

In July 2000 Devon underwent a physical capacities evaluation (PCE) to determine whether he could continue to work as a heavy equipment operator. Devon was able to push and pull a 350–pound cart, although at 400 pounds he demonstrated severe scapular winging,[1] and could lift thirty-five pounds above his shoulders. He was certified for medium work. The evaluation also noted that Devon had no strength above his shoulders and that his neck could not take any impact. Sometime after the PCE Devon was referred by his surgeon, Dr. Louis Kralick, to Dr. Michael Gevaert for a permanent partial impairment (PPI) rating; Dr. Gevaert conducted the evaluation in November 2000. Based on pain and decreased shoulder mobility, the shoulder surgery, the prior neck surgery, and related nerve damage, Dr. Gevaert assigned Devon a PPI rating of twenty-

---

1. Scapular winging occurs when the scapula, or shoulder blade, protrudes away from the back. This condition is caused by paralysis of the serra-tus anterior muscle. STEDMAN'S MEDICAL DICTIONARY 1387 (25th ed.1990).

seven percent.[2] The municipality paid Devon $36,500 based on this rating.[3] Dr. Gevaert agreed that Devon could return to medium work, but noted that he risked reinjury if he was exposed to vibration. Devon returned to work on January 14, 2001.

After ten days of work, on January 24, 2001, Devon reported neck pain from the vibration associated with operating the grader. The same day Devon's request for reemployment benefits was denied. Within a few days, Devon requested and obtained notes from Drs. Gevaert and Kralick that restricted him from operating the grader but allowed him to operate other heavy equipment. Based on these notes, the Reemployment Benefits Administrator reconsidered Devon's application and granted him reemployment benefits on February 8, 2001. According to the municipality, Devon was paid $16,500 in temporary total disability (TTD) benefits from January 24, 2001 until June 30, 2001. He was placed on annual sick leave until March 2001, when the municipality terminated him.

Devon filed a claim for workers' compensation benefits based on the injuries to his "neck and spine" sustained while operating the grader in January 2001. An evaluation done by the municipality's physician, Dr. Thad Stanford, in May 2001 concluded that Devon was unable to operate a grader due to his injuries. Dr. Stanford recommended further evaluation of Devon's shoulder injuries. On June 18, 2001 Dr. Douglas Savikko examined Devon; he observed significant weakness and loss of mobility in Devon's right arm and shoulder and noted that the vibration associated with operating a grader would cause pain in his neck and upper back. He recommended reassignment to a less "traumatic" work detail.

The municipality hired a private investigation firm which filmed Devon engaging in various activities in June and July of 2001 that seemed inconsistent with his claims of debilitating shoulder pain.[4] Without telling Devon about the tapes, the municipality deposed him in October 2001. At the deposition Devon repeated his claims of elbow and shoulder problems, noting that he had limited mobility and significant pain in his right arm and shoulder. Specifically, he stated that if he tried to straighten his right elbow he would "drop to the floor" "reeling in pain," and that when his elbow was straightened, the pain was "excruciating." He also said he was unable to throw a football or use his arms to pull a sled behind him. Overall, he denied engaging in any physical activities other than being a Girl Scout leader, and noted that even hugging his children was painful. However, Devon agreed that he rode a motorcycle and possessed a commercial driver's license (CDL). He also related that he regained some mobility in his right arm when medicated, but noted that the gains were limited.

Upon reviewing the tapes, Dr. Stanford changed his opinion. Dr. Stanford stated that after viewing the activities he "did not see any impairment." He therefore concluded that the January 2001 cervical injury only resulted in temporary aggravation of Devon's neck and shoulder problems and that it was "more likely than not that he has been medically stable since roughly the end of January of 2001."[5]

---

2. While most of the rating was objectively determined, the portion of the PPI rating related to Devon's shoulder mobility and pain was based on Devon's comments to Dr. Gevaert.

3. Under former AS 23.30.190, PPI payments were determined by multiplying the PPI percentage by $135,000.

4. Specifically, investigators observed Devon:

[R]iding his Harley Davidson motorcycle. Conducting physical labor maintaining a ball field including starting a pitching machine with a rope starter using both arms, dragging a wire mesh harrow around the infield with both arms behind his back and lifting the harrow over his head. Subject was also taped raking and using a wheel barrow and was observed lifting heavy items. Subject was also taped playing softball that included activities such as batting, throwing, running, and catching a softball.

5. Once an injured employee is medically stable, he or she may not receive temporary total disability payments. AS 23.30.185. An employee is medically stable once "further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care or the possibility of improvement or

Dr. Gevaert also viewed the surveillance tapes and he later testified about them in front of the board. He noted that some of the activities, such as pulling the harrow, were "somewhat unusual," but "not inconsistent" with either his evaluation or Dr. Savikko's June 2001 evaluation. However, he felt that overall, the difference between Devon's condition at the Savikko evaluation and his videotaped abilities was highly unusual. Dr. Gevaert observed that Devon reported that his shoulder showed no improvement in early 2001, and that his medical records show that it had worsened by the June 19 Savikko evaluation, but then noted that Devon displayed full use of his shoulder and no evidence of pain when videotaped playing softball nine days later. He characterized this improvement as "very dramatic" and stated that Devon's ability to engage in these activities without evincing pain or reduced mobility was "striking." Dr. Gevaert concluded that Devon's 2000 PPI was "[p]robably not" accurate and agreed that Devon had misrepresented his physical condition to his doctors. However, when questioned by Devon's counsel, Dr. Gevaert said that he could not say that Devon lied to him or consciously misrepresented his condition in November 2000. Dr. Gevaert further stated that he could not say that it was more likely than not that Devon's PPI rating was incorrect. But on rebuttal Dr. Gevaert offered contradictory testimony. First, he agreed that it was more likely than not that the November 2000 PPI rating was incorrect because it undercounted Devon's range of motion in his shoulder, and said that this error made Devon's PPI score four to seven percent higher than it should have been. Second, he admitted that he suspected Devon of a "certain degree of malingering."

Dr. Gevaert also noted that Devon had been taking the pain relievers Percocet and Oxycontin but was unaware whether Devon had taken them before his November 2000 evaluation. And he admitted that medication could lead to some improvement and that it was possible, albeit unlikely, that narcotics could allow someone with Devon's level of injury to engage in the taped activities without showing pain or discomfort. He also said that if someone were to have a normal recovery, then they could have demonstrated Devon's level of injury at the November 2000 exam and still engaged in the activities on the tape (which took place six months later) without pain or medication.

Devon also testified in front of the board, admitting that the tapes seemed "pretty damning." He explained the difference between his November 2000 PPI and the activities on the tapes by claiming that he had not been medicated when he was examined by Dr. Gevaert and that he was able to do more when medicated. He suggested, but did not explicitly state, that he was on medication when he was videotaped.[6] Finally, he agreed that his answer in the October deposition that he could not throw a ball was "if not false . . . a distortion of the truth."

### B. Proceedings

Based on the surveillance tapes and Devon's deposition testimony, the municipality filed a petition with the Alaska Workers' Compensation Board seeking reimbursement of PPI benefits, TTD benefits from January to June of 2001, reemployment benefits and associated costs and attorney's fees. The municipality argued that Devon had fraudulently obtained benefits in violation of AS 23.30.250(b)[7] by lying about the extent of his

deterioration resulting from the passage of time. . . ." AS 23.30.395(21).

6. Devon did not explicitly admit that he had taken medication before he was videotaped. Instead, he said that:

[W]hen I know that I'm going to be doing some physical activity, I will medicate ahead of time, because I know that it—that I won't be able to do a lot of things if I don't. . . . I try not to take the medication all the time. . . . I really don't want to be addicted to any narcotic . . .

and that's probably why there may be some inconsistencies . . . in my activity.

7. AS 23.30.250(b) states in relevant part:

If the board, after a hearing, finds that a person has obtained compensation, medical treatment, or another benefit provided under this chapter by knowingly making a false or misleading statement or representation for the purpose of obtaining that benefit, the board shall order that person to make full reimbursement of the cost of all benefits obtained. Upon entry of an order authorized under this subsec-

injuries and by failing to inform his vocational counselor that he had driven an eighteen-wheel tractor-trailer in a previous job. It requested reimbursement under subsection .250(b), modification under AS 23.30.130 [8] of Devon's eligibility for reemployment benefits, and referral of the case to the District Attorney's office.

In regard to the PPI benefits, the board held that Devon's videotaped activities were explainable as "either being not inconsistent with the November 2000 PPI rating or possible with pain medications." The board found Dr. Gevaert to be sincere but noted that his testimony was "at times incongruous" and held that when considered as a whole, his testimony did not support the municipality's claim. The board noted that there was "a lack of significant inconsistency between the employee's physical abilities at the July 11, 2000 PCE and the activities in the videotapes," and noted that this also refuted the municipality's claims of knowing misrepresentation.

As to the TTD benefits, the board highlighted Dr. Gevaert's testimony that he relied on the neck condition in finding Devon to be unable to work on the grader, and thus concluded that these benefits were properly awarded. The board essentially held that, as Devon's TTD benefits were based on his neck condition, any misrepresentations about his shoulder condition were immaterial.

In regard to the reemployment benefits, the board held that the municipality's claim that Devon tried to conceal that he had driven a truck were "baseless" and declined to amend the award of reemployment benefits because Devon listed his CDL on his résumé and told the vocational counselor that his prior job involved driving a truck.

Finally, the board declined to refer the matter of Devon's misrepresentations for criminal prosecution. Although the board noted that there were "troubling" problems with Devon's testimony, it held that he did not knowingly misrepresent his condition at the October deposition because, while he denied being able to throw a ball, he noted that he retained some capabilities in that arm. The board also relied on Dr. Gevaert's testimony, which it said revealed that Devon "likely" could throw a softball if medicated.

The municipality appealed this decision to the superior court, arguing that the board lacked substantial evidence for its conclusions, applied the incorrect legal standard of proof, and improperly admitted certain medical records. Superior Court Judge William F. Morse affirmed on all counts. Judge Morse held that the board properly applied the preponderance of the evidence standard, as required by this court in *DeNuptiis v. Unocal Corp.*[9] He also found that there was substantial evidence to support the board's decision, citing its conclusion that Dr. Gevaert did not change his PPI rating after viewing the tapes, the fact that the TTD benefits were based on the neck injury, and the fact that Devon told the vocational counselor he had driven a truck at work and that he possessed a CDL. Finally, Judge Morse rejected the municipality's argument regarding the medical records, holding that even if the records were improperly admitted, any error was harmless because the board did not rely upon the reports in its decision.

## III. STANDARD OF REVIEW

We independently review the merits of an administrative decision when the superior court acts as an intermediate court of appeals.[10] In reviewing the board's decision, we review factual findings to ensure they are supported by substantial evidence.[11] Substantial evidence is defined as "such relevant evidence as a reasonable mind might

---

tion, the board shall also order that person to pay all reasonable costs and attorney fees incurred by the employer and the employer's carrier in obtaining an order under this section and in defending any claim made for benefits under this chapter.

8. AS 23.30.130(a) lists various grounds for the modification of a workers' compensation award, including mistake of fact.

9. 63 P.3d 272, 277–78 (Alaska 2003).

10. *Cowen v. Wal–Mart,* 93 P.3d 420, 424 (Alaska 2004).

11. *Id.*

accept as adequate to support a conclusion."[12] However, we do not reweigh the evidence or choose between competing inferences; we only determine whether such relevant evidence exists.[13] Determining witness credibility is left entirely to the board.[14]

We review the board's decisions regarding the admissibility of evidence for an abuse of discretion.[15] We find an abuse of discretion exists only if we are left with the definite and firm conviction that a mistake has been made.[16]

## IV. DISCUSSION

### A. The Board's Decision that Devon Did Not Fraudulently Obtain Workers' Compensation Benefits Was Not Erroneous.

█ The municipality bore the burden of proving by a preponderance of the evidence that Devon knowingly made false or misleading statements for the purpose of securing workers' compensation benefits.[17] Alaska Statute 23.30.250(b) requires repayment of employment benefits when "a person has obtained compensation, medical treatment, or another benefit provided under this chapter by knowingly making a false or misleading statement or for the purpose of obtaining *that* benefit...." (Emphasis added.) The board applies a four-part test for fraud claims. The employer must show that: (1) the employee made statements or representations; (2) the statements were false or misleading; (3) the statements were made knowingly; and (4) the statements resulted in the employee obtaining benefits.[18] As it comports with the language of AS 23.30.250(b), we adopt this test. Thus, to succeed in this appeal the municipality must show that the board lacked substantial evidence to conclude that Devon did not secure worker's compensation benefits through such statements or actions.

### 1. Substantial evidence supports the board's finding that Devon did not fraudulently obtain PPI benefits.

PPI benefits were awarded as a result of Dr. Gevaert's PPI rating in November 2000. Accordingly, the critical question is whether Devon obtained excess PPI benefits by intentionally misleading Dr. Gevaert in November 2000 when the PPI evaluation was conducted. The board concluded that the municipality's surveillance tapes were not compelling evidence that Devon engaged in fraudulent behavior. This conclusion was based on three key findings: (1) that nearly all of the activities on the videotapes were explained away by Dr. Gevaert as not inconsistent with the November 2000 PPI rating; (2) that Dr. Gevaert testified that Devon's range of motion would have been improved with medication and that Devon testified that he took medication when he engaged in physical activities; and (3) there was little inconsistency between Devon's physical abilities at the July 2000 PCE and the videotaped activities. The municipality maintains that the surveillance tapes and Dr. Gevaert's testimony show that Devon fraudulently secured benefits, and thus argues that the board's conclusion is not supported by substantial evidence. As explained below, we disagree.

### (a) Dr. Gevaert's testimony as to the November 2000 evaluation

As noted above, the board was faced with deciding whether Devon obtained excess PPI benefits by intentionally misleading Dr. Gevaert in November 2000, when the PPI evaluation was conducted. The board relied on Dr. Gevaert's testimony in concluding that "[n]early all" of the videotaped activities were not inconsistent with the November 2000 evaluation. The board specifically referred to his testimony that dragging a

12. *Id.* (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000)).

13. *Id.*

14. *Id.*

15. *DeYonge*, 1 P.3d at 94.

16. *Id.*

17. *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 277–78 (Alaska 2003).

18. *See Church v. Silver Bay Logging, Inc.*, No. 99–0139 (Alaska Workers' Comp. Bd., June 24, 1999).

screen across the infield of a softball field was not inconsistent with the earlier evaluation. While Dr. Gevaert testified that Devon likely misrepresented his condition to the other doctors in spring of 2001, he did not testify that Devon misrepresented his symptoms in November 2000. The board relied on Dr. Gevaert's testimony that he was unable to say whether Devon intentionally misrepresented his condition at the November 2000 evaluation.[19] Although later portions of his testimony could be read as contradicting this statement,[20] the board was entitled to rely on his earlier testimony that he could not say that Devon misrepresented his condition in November 2000. It is significant that there was a six-month gap between the November 2000 PPI and the municipality's surveillance. As Dr. Gevaert stated, a person who recovered normally could have engaged in the activities on the tape without pain. Thus, even if Devon lied or misrepresented the fact that his shoulder was recovering throughout 2001, it is possible that he was not exaggerating his condition at the time of the PPI evaluation.

### (b) Dr. Gevaert's testimony concerning pain medication

The board relied on Dr. Gevaert's testimony that pain medication could have affected Devon's ability to engage in the activities shown on the videotape. The doctor testified, for example, that carrying several soccer balls in a bag as Devon did in the videotape would be possible if the person had

19. Devon's counsel and Dr. Gevaert engaged in the following exchange:

> Q: [A]re you saying, then, [in] November 2000 that Mr. Devon lied to you; that is consciously misrepresented his physical capacities? Yes, no, or you can't say.
> A: I can't say.
> Q: Thank you. Would you agree—and this is the legal standard—that you cannot say to a reasonable degree of medical certainty, more likely than not, that Mr. Devon's PPI rating of November '00 as of that date was wrong?
> A: That's correct, I can't say it was wrong.

20. First, Dr. Gevaert agreed that the November 2000 PPI evaluation was more likely than not wrong. Then, he admitted to suspecting Devon of "a certain degree of malingering." And finally, when asked whether he agreed with the statement that "the only time that Mr. Devon shows

taken pain medication. The board accepted Devon's testimony that he had not taken pain medication before the PPI evaluation but that he did take pain medication before engaging in physical activities of the type shown in the surveillance tapes. The board also relied on Dr. Gevaert's testimony that Devon would have a better range of motion when medicated.[21]

### (c) Consistency between July 2000 PCE and videotaped activities

The board lastly relied on "a lack of significant inconsistency" between Devon's condition as shown in the July 2000 PCE and his activities shown in the videotapes. At the July 2000 PCE Devon was able to push and pull up to 400 pounds without complaining of pain, was able to lift and manipulate weights of up to thirty-five pounds over his shoulder, and was able to lift a weight of forty pounds to his shoulder height. Dr. Gevaert stated that all of this was consistent with what was shown on the videotape.[22] While Dr. Gevaert was careful to point out that a physical capacities evaluation is undertaken for a different purpose than a permanent partial impairment rating, the board was entitled to rely on the similarities in Devon's condition in July 2000 (as shown in the PCE) and in June–July 2001 (as shown in the videotapes) to support its conclusion that the municipality had not established a case of misrepresentation.

> [a] reduced range of motion is when he's either with a doctor or in a deposition, and that when he's recreating there is no loss of motion," he responded: "That is correct."

21. Dr. Gevaert's testimony on this subject was not without internal contradictions. As noted by the municipality, he also testified that while pain medication "can reduce the pain and allow people to participate in certain activities, ... it won't reduce the pain completely so that we don't see any secondary effects of guarding for pain, of rubbing the shoulder, etc." He concluded that it was "kind of unlikely" that Devon could have engaged in all of the activities on the tapes without demonstrating any signs of pain.

22. The only inconsistency noted by Dr. Gevaert was that, in the videotape, Devon showed no indication of pain or guarding.

### (d) Conclusion

The board's finding that the municipality did not show by a preponderance of the evidence that Devon obtained benefits by making knowing misrepresentations was not clearly erroneous.[23] Like the board, we note that Devon's testimony certainly has "troubling aspects." And it is not unthinkable that upon *de novo* review, we would be less inclined to credit the testimony of a witness who admitted that he made statements about his physical capabilities that were "if not false, a distortion of the truth," who had previously been convicted of dishonesty, and who lied about being a member of a workers' union in a deposition. However, in this situation, we are bound by both the deferential standard of review that we apply to the board's decisions and by statute; AS 23.30.122 states that "[t]he board has the *sole* power to determine the credibility of a witness." (Emphasis added.) It may well be that "[e]very violation of truth is not only a sort of suicide in the liar, but is a stab at the health of human society."[24] But given the standard of review, we are unable to usurp the role of the board and consider whether such a wounding has occurred.

### 2. Substantial evidence supports the board's finding that Devon did not fraudulently obtain TTD benefits.

The municipality also argues that the board's decision to dismiss its claim that Devon fraudulently secured TTD benefits was not supported by substantial evidence. The board noted that the TTD benefits were based on Devon's inability to withstand the vibration associated with operating a grader, and Drs. Gevaert, Savikko, and Kralick cited Devon's cervical problems as the reason for limiting his exposure to vibration. Dr. Stanford changed his view of Devon's neck injury after viewing the tapes, but Dr. Gevaert declined to do so, noting that any error in shoulder mobility was unrelated to his decision to excuse Devon from operating the grader. Even if Devon was untruthful about his shoulder injury, that misrepresentation did not increase or affect TTD benefits paid for the neck injury. Thus, Dr. Gevaert's testimony provides substantial evidence for the board's judgment on the TTD benefits.

### 3. Substantial evidence supports the board's finding that Devon did not fraudulently obtain reemployment benefits.

The municipality argues that Devon is not entitled to his reemployment benefits because he was not entirely candid with Elisa Hitchcock, his vocational specialist. He was asked to supply her with a list of all jobs he had held in the last ten years, and she testified that he did not list commercial truck driver as one of his past occupations. Thus, she did not consider this job when looking for alternative employment for Devon and testified that she could have found Devon a truck driving job had she known this information sooner. The municipality argues that it could have avoided $11,000 in reemployment benefits. However, this argument fails because there was sufficient evidence for the board to conclude that Devon did not knowingly mislead Hitchcock. Hitchcock testified that Devon gave her a copy of his CDL and informed her that he drove a truck as part of his job. The information provided by Devon seems to have been part of a good-faith effort to inform the counselor of his work experience, and examination of his résumé and status as a CDL holder should have led Hitchcock to consider truck driving as a possible job for Devon. Therefore, we conclude

---

**23.** The municipality also argues that the board erred either by "abdicat[ing]" its duty to make a specific finding regarding Devon's credibility or by relying on Devon's testimony when, in the municipality's view, Devon was wholly unbelievable. The board accepted Devon's testimony that he did not take medications prior to the November 2000 evaluation and found it "plausible" that he self-medicated before engaging in physical activities. Although not explicit, this reliance on Devon's testimony demonstrates that the board found him to be credible. *Cf. Hoth v. Valley Constr.*, 671 P.2d 871, 874 n. 3 (Alaska 1983) ("Absent specific findings by the Board that it chose to disbelieve a witness's testimony, we will not assume that lack of credibility was a relevant factor in the Board's decision.").

**24.** RALPH WALDO EMERSON, *Essay VII: Prudence, in* EMERSON'S ESSAYS 135 (DENT 1906) (1841).

that there was substantial evidence to support the board's decision on this point.[25]

### B. Any Error in Admitting Various Medical Reports Without Allowing the Municipality To Cross–Examine the Reports' Authors Was Harmless.

■ The municipality argues that the board's decision should also be reversed because it relied on medical reports from doctors who were not made available for cross-examination. The municipality notes that it was entitled to cross-examine the author of the reports under *Commercial Union Cos. v. Smallwood*,[26] and argues that because its request was not granted, the reports were inadmissible. It asks for reversal because "the weight given the reports cannot be gleaned" from the board's decision.

The municipality argues that these reports are inadmissible because the authors were not Devon's treating physicians, they were not selected by the municipality, and the evaluation was not undertaken for the workers' compensation claim. However, as the superior court pointed out in its decision affirming the board on this issue, the municipality did not object to introduction of the medical reports of two of the doctors and did not request an opportunity to cross-examine the third doctor. Since the municipality did not object to introduction of the documents, Devon did not have the opportunity to establish the requisite foundation. Further, even

assuming for the sake of argument that the board erred in admitting the reports, the municipality bears the burden of showing that it was prejudiced by the board's admission of these reports.[27] We are unable to conclude based on the record that the reports' admission prejudiced the municipality.

■ In determining whether an error was harmless, we examine whether it affected the final verdict.[28] Factors relevant to this determination include the relative amount of time at trial devoted to the evidence[29] and whether the inadmissible evidence was cumulative and largely replicated other admissible evidence.[30] In this case, the board heard no testimony about these reports. Moreover, it only mentioned the reports in its factual summary; its substantive discussion focused on Dr. Gevaert's testimony, Devon's testimony, and the existing record. In addition, the information in the contested reports essentially restated evidence already in the record.[31] We conclude that the municipality has not met its burden of showing that it was prejudiced by the board's admission of the reports. Thus, even if the board erred in admitting the reports, any error is harmless because it did not rely on the reports in its final decision.

## V. CONCLUSION

Because there was substantial evidence to support the board's findings that Devon did

---

**25.** In addition, the municipality does not offer any evidence to show that Devon intentionally misrepresented his work history. Alaska Statute 23.30.250(b) requires that any misrepresentation or falsehood be knowing. Even if Devon's description of his work history was less than clear, the lack of intentionality also undermines the municipality's argument.

**26.** 550 P.2d 1261 (Alaska 1976). In *Smallwood* we held that parties have a right to cross-examine authors of reports submitted for review by the board. *Id.* at 1265–66.

**27.** *Dobos v. Ingersoll*, 9 P.3d 1020, 1024 (Alaska 2000) (citing *Zerbinos v. Lewis*, 394 P.2d 886, 889 (Alaska 1964)).

**28.** *Wyatt v. State*, 981 P.2d 109, 115 (Alaska 1999) ("A non-constitutional error is harmless if

it did not 'appreciably affect the jury's verdict.' ") (quoting *Love v. State*, 457 P.2d 622, 631–32 (Alaska 1969)).

**29.** *Dobos*, 9 P.3d at 1024–25 (citing *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 773 (Alaska 1982)).

**30.** *Jackson v. White*, 556 P.2d 530, 534 n. 13 (Alaska 1976) (introduction of hearsay evidence harmless error where evidence cumulative of other evidence).

**31.** The contested evaluations noted that Devon had cervical problems stemming from his C6/C7 fusion, that he could push or pull unlimited amounts of weight, that he displayed scapular winging, and that he had limited lifting capabilities. These results are not significantly different from the results of the July 2000 PCE.

not fraudulently secure PPI, TTD, or reemployment benefits and because any error in the admission of medical reports not subject to cross-examination was harmless, we AFFIRM the superior court's decision upholding the board's decision denying the municipality's petition for reimbursement of benefits.[32]

---

32. Devon also requests that this court grant him attorney's fees for not only this appeal, but also for stayed proceedings regarding the amount of attorney's fees owed to him for the fraud hearing and his appeal to the superior court. However, because neither the board nor the superior court has issued a final order on this point, it is not properly before us.