Kenneth J. SEYBERT, Appellant and Cross–Appellee,

v.

COMINCO ALASKA EXPLORATION and Alaska National Insurance Co., Appellees and Cross–Appellants.

Nos. S–12085, S–12115.

Supreme Court of Alaska.

May 2, 2008.

Rehearing Denied July 9, 2008.

---

**36.** 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

**37.** 85 F.3d at 431.

**38.** *Id.*

1080

James M. Hackett, Law Office of James M. Hackett, Fairbanks, for Appellant and Cross–Appellee.

Robert J. McLaughlin, Mann, Johnson, Wooster & McLaughlin, P.S., Tacoma, Washington, for Appellees and Cross–Appellants.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Kenneth Seybert injured his neck while he was working as a millwright for Cominco Alaska at the Red Dog Mine in 1992. He had two surgeries and, after a physician determined he was medically stable, was evaluated for reemployment benefits. In January 1995 Seybert and Cominco executed a Compromise and Release (C & R) to settle Seybert's workers' compensation claim. Seybert was not represented by counsel. The C & R identified two disputes: (1) whether Seybert could change physicians, and (2) whether the reemployment plan developed for Cominco was appropriate. Under the terms of the C & R Seybert was permitted to change physicians one time and received $30,000 for all claims except future medical benefits. In 2000 Cominco controverted Seybert's prescription claims. In May 2001 Seybert, now represented by counsel, asked the Alaska Workers' Compensation Board to set aside the C & R. After a hearing on his request the board refused to set aside the agreement. The superior court affirmed the board in all respects. On appeal Seybert raises numerous issues related to the board proceedings; Cominco cross-appeals a superior court order remanding the case to the board during the pendency of the superior court appeal. Because the board applied an incorrect legal standard when it evaluated Seybert's misrepresentation claim, we reverse the board's denial of Seybert's petition to set aside the C & R and remand the case to the board for further proceedings. We find no merit in Cominco's cross-appeal and affirm the superior court's decision to remand the case to

the board for evaluation of one of Seybert's claims.

## II. FACTS AND PROCEEDINGS

In 1992 Kenneth Seybert was living in Elko, Nevada, a town in northeast Nevada about equidistant from the Utah and Idaho borders. He had worked as a millwright at various mines for the previous ten years. Seybert worked for Cominco at the Red Dog Mine near Kotzebue as a millwright in early 1992. His work schedule was twenty-eight days on and fourteen off. Near the end of his second rotation at the mine, he injured his neck at work. He was rebuilding a pump and had positioned the discharge end with a forklift. Because it was not aligned correctly, Seybert used a pry bar to push the discharge end into proper position. While he was pushing on the pry bar, he reached to get a bolt; the weight shifted, and he felt his neck "pop." He immediately felt pain and went to the clinic on site at the mine during his shift that night. The medic on staff diagnosed a probable shoulder muscle injury and prescribed pain medication and a muscle relaxant. Seybert worked a few days after the injury to complete his rotation, even though he continued to experience pain.

In late April 1992 Seybert went to see Dr. Alvin Wirthlin, a neurologist in Salt Lake City, Utah, the closest large city to Elko. Dr. Wirthlin determined that Seybert had a cervical spine injury and referred him to a neurosurgeon, Dr. Charles Rich. Dr. Rich operated on Seybert's cervical spine in May. At about the same time, Seybert requested an eligibility evaluation for reemployment benefits "in case [he] need[ed] it." In June the Reemployment Benefits Administrator (RBA) sent Seybert a letter and requested medical reports that predicted a permanent physical impairment. No one took further action on the reemployment benefits request at that time.

Seybert stayed in treatment with Dr. Rich for several months. Seybert saw Dr. Hilari Fleming, another neurosurgeon, in Reno, Nevada for a second opinion after Dr. Rich

suggested a second surgery. After a course of conservative therapy with no improvement, Dr. Fleming also recommended a second surgery. At that point Dr. David Dapra conducted an independent medical evaluation (IME) on behalf of Cominco and Alaska National Insurance Co., Cominco's workers' compensation insurer.[1] Dr. Dapra disagreed with Dr. Fleming's diagnosis and recommended against surgery. After an Alaska National nurse reviewed the medical reports, Alaska National authorized the surgery with Dr. Fleming.

In May 1993 Dr. Fleming wrote that Seybert had sustained a permanent partial impairment as a result of his injury and would not be able to do heavy lifting or other repetitive heavy work. About a month later, Alaska National asked the RBA to refer Seybert for a reemployment benefits eligibility evaluation. Seybert had his second neck surgery in July 1993. In late July he was referred to a rehabilitation services office in Reno for an eligibility evaluation. Dr. Fleming wrote to the rehabilitation specialist working with Seybert that Seybert would be limited to light or sedentary work in the future. The rehabilitation specialist recommended to the RBA that Seybert be found eligible for reemployment benefits. After the RBA found him eligible for benefits, Seybert chose Jacqueline Christensen of Reno as his rehabilitation specialist. Christensen began an assessment of Seybert but did not complete a reemployment plan for him.

After the second surgery, Seybert reported that his pain was as bad, if not worse, than before the surgery. In November 1993 Dr. Fleming recommended that he attend a pain management program. Alaska National referred Seybert to the pain clinic at Virginia Mason Medical Center in Seattle. Dr. Fleming apparently agreed to this pain clinic, although she did not select it. Alaska National specifically requested that two care providers at Virginia Mason, Drs. Thomas Williamson–Kirkland and Steven Fey, provide services to Seybert. The reemployment

---

1. In this opinion, we refer to Cominco and Alaska National Insurance Co. collectively as "Alaska National."

efforts were held in abeyance until Seybert completed the program.

The pain management clinic did not resolve Seybert's pain complaints. Seybert attended the outpatient program at Virginia Mason for about four weeks. Dr. Williamson–Kirkland believed that Seybert's main problem was anger at having been injured and consequently not being able to continue at his prior high level of pay. At the end of the pain management clinic, Dr. Williamson–Kirkland stated that Seybert had reached medical stability and had a whole person permanent partial impairment (PPI) rating of twenty-eight percent.[2] After receiving Dr. Williamson–Kirkland's report and discussing it with him, Alaska National determined that Seybert needed no further treatment and advised Seybert of this by telephone. Seybert filed an Application for Adjustment of Claim and a supplemental statement with the Alaska Workers' Compensation Board on about March 30, 1994. Alaska National filed an answer on May 3, 1994.

After completing the pain management program, Seybert returned to Elko. While he was in Elko, Seybert went twice to consult with Dr. Terry Nevins for neck pain. At that point it appears that Dr. Fleming's office did not feel it could provide Seybert with further treatment because he did not have surgical needs. Alaska National's attorney, Robert McLaughlin, wrote to Dr. Nevins on May 24, 1994. In his letter he informed Dr. Nevins that Alaska National would be controverting his care of Seybert, that Seybert had seen too many physicians, and that "[b]oth Dr. Fleming and Dr. Williamson–Kirkland have concluded that further medical care is not indicated." McLaughlin followed up with a phone call. Dr. Nevins wrote in the chart notes regarding the conversation that "Mr. Seybert apparently has quite a lengthy history of seeing numerous physicians." In late May Alaska National formally controverted the medical claims for treatment by Dr. Nevins. Its controversion was based on an excessive number of changes of physician and on Dr. Williamson–Kirkland's

statement that no further medical treatment was necessary.

Alaska National then asked another vocational rehabilitation specialist in Reno, Ed Howden, to prepare a reemployment plan. Howden developed a reemployment plan without speaking to Seybert. His plan was to retrain Seybert as a mining or environmental laboratory technician. While the pay scale for this position was low at the beginning, Howden felt that in as few as three years, the pay scale could be in the range of $15 to $20 per hour.

In mid-June Christensen, the rehabilitation specialist who had been working with Seybert, wrote to the RBA to explain her delay in plan preparation. According to Christensen the delay was the result of numerous difficulties, including obtaining medical records from Virginia Mason and having Seybert tested in Elko. In addition she stated that Alaska National had requested that she delay her report so that it could discuss the matter with Seybert, but it never got back in touch with her. At the time she filed her report with the RBA in June 1994, she felt that Seybert would not benefit from an immediate reemployment plan because he was still having difficulty adjusting to his injury and was experiencing significant pain. She recommended some type of interruption in his plan, if permitted, and if the plan could not be delayed, she thought that it would be appropriate for the parties to consider settlement.

At about the same time Seybert and Linda Rudolph, the claims adjuster for Alaska National, first discussed settlement. Rudolph's telephone log notes from June 2, 1994, indicated that she would present Seybert with the options of either accepting a settlement offer or contacting Howden to pursue a vocational rehabilitation plan. On June 7, 1994, Rudolph wrote to Seybert, making an offer as described in the log notes. She gave him the option of participating in vocational counseling with Howden or settling his permanent impairment claims for a lump sum. Seybert apparently did not receive this let-

---

**2.** This was later reduced to twenty-six percent after Alaska National questioned the doctor's calculations.

ter. When Alaska National tried to call him in Elko on June 6, his phone had been disconnected.

In late May 1994 Seybert and his wife had moved to Lincoln City, Oregon, about nine hundred miles from Elko, because his wife had found work there. Before moving to Oregon Seybert had applied for federal Social Security disability insurance (SSDI) benefits. He was found eligible on August 26, 1994. Seybert told Alaska National in September 1994 that he had been found eligible for SSDI.

During the time he was in Oregon Seybert paid for his medical care and prescriptions related to his neck pain on his own. Seybert remembered taking five prescription medications in 1994 and early 1995.

Alaska National submitted Howden's vocational plan to the RBA in July 1994. The RBA reviewed the plan and denied it. An informal conference about the reemployment plan was held in October 1994. Seybert, McLaughlin, and the two vocational counselors from Nevada participated by telephone. Christensen stated at the conference that she did not think a plan could be written for Seybert due to his pain, and Seybert explained that he was getting SSDI and had permanently relocated to Lincoln City. At the end of the conference Alaska National requested that its plan be reviewed with supplemental information that it had supplied. On October 29, 1994, the RBA rejected Alaska National's reemployment plan and expressed concern that Howden had not met with Seybert to discuss job options. On November 10, 1994, Alaska National petitioned the board to review the RBA's decision and on November 14, 1994, asked the RBA to reconsider his decision. On December 5, 1994, the RBA reaffirmed his rejection of Alaska National's reemployment plan and suggested that another rehabilitation specialist be assigned because of Seybert's move to Oregon.

While the reemployment process continued, the parties discussed settlement. On October 17, 1994, Seybert called Rudolph and said that he was interested in settling. According to Rudolph's notes, Seybert told her that he was "taking amitript[y]line, pain meds., anti-inflam., etc." and was paying for them himself. Her notes then show her calculations regarding benefits for which Seybert might still be eligible, including PPI benefits of $14,821.96 and subsection .041(k) benefits that would total $25,163.32 for a year.[3]

Alaska National paid for Seybert to see Dr. Fleming in Reno on November 3, 1994. This was the first time Dr. Fleming had seen Seybert in about a year. Dr. Fleming examined Seybert and concluded that he would need ongoing medical care, which she was not able to provide because he was living in another state. She informed Alaska National that she "strongly recommend[ed] that he be allowed to find a physician in preferably the Portland or Salem area to follow up with him for his chronic pain problems."

Alaska National next proposed settlement in a December 2, 1994 letter Rudolph sent to Seybert. In the letter Rudolph told Seybert that he had three remaining benefits available on his claim: (1) reemployment benefits; (2) PPI benefits; and (3) medical benefits. She expressed the opinion that Alaska National's reemployment plan was appropriate and that Seybert would be required to cooperate with the plan. She said that Seybert was entitled to further medical care as the result of his injury but that he had already "made a number of physician changes" and had "used up [his] statutory allowance of physicians." She told him that the total of the remaining benefits payable to him was $18,890.72;[4] she offered to settle his claims for $25,000, minus any PPI benefits paid from November 27, 1994, until the date of board approval of the settlement and, as part of the settlement, to permit him to select a new physician in his local area.

---

3. AS 23.30.041(k) states that if an employee's PPI benefits are exhausted before the end of a reemployment plan, the employer must provide compensation equal to seventy percent of spendable weekly wages until completion of the plan.

4. This amount is the sum of the out-of-pocket expenses that Howden estimated his reemployment plan would cost and the remaining PPI due Seybert.

Seybert rejected this offer. Rudolph recorded that on December 7, 1994, Seybert requested $50,000 to settle the claim because he had "lost [his] livelihood, everything." He also told her that he might be moving again. Alaska National then decided to offer $30,000. On December 27, 1994, Rudolph wrote to Seybert, offering to settle his workers' compensation claim for $30,000, with no deduction for ongoing PPI if Seybert returned the settlement documents to Alaska National within ten days. Seybert would also be allowed to select a new physician in his local area, and Alaska National would "be responsible for further medical care with that physician in accordance with the Alaska Workers' Compensation statutes." She told him that the offer would remain open until January 9, 1995. On January 6, 1995, after a long discussion with Rudolph, Seybert agreed to the settlement as offered.

McLaughlin drafted and sent Seybert a settlement agreement for his signature. The settlement agreement specifically waived two benefits that had not been discussed with Seybert during settlement negotiations: permanent total disability (PTD) benefits and benefits under AS 23.30.041(k). Seybert signed the agreement on January 23; the settlement was approved by the board without a hearing on February 14.

In early 1995 Seybert moved to Butte, Montana. He began treatment with Dr. Gary Cooney, a neurologist in Missoula, Montana in the spring of 1995. Dr. Cooney's report indicated that in his opinion, Seybert was totally disabled. He prescribed medication and a heating pad to provide symptomatic relief. Dr. Cooney continued to treat Seybert with pain medications.

In April 2000 Alaska National sent Seybert to Seattle for an IME with Drs. Williamson–Kirkland and Fey at Virginia Mason. Their report concluded that Seybert was taking too many narcotic pain medications, that Dr. Cooney should decrease Seybert's narcotics, and that the only medications that Seybert should be taking were Trazodone, an antidepressant to help him sleep, and Zantac for gastroesophageal complaints. They also stated that Seybert should have no further medical treatment related to his neck. Alaska National controverted Seybert's medical care in May 2000, claiming that the only medications that Seybert should take were Trazodone and Zantac. Alaska National wrote that it would support a detoxification program recommended by Seybert's treating physician. Seybert filed a workers' compensation claim in July 2000; he attached a long letter in which he requested a hearing, alleged that Rudolph had promised him lifetime medical benefits and that he was coerced into signing the settlement, and complained about the doctors at Virginia Mason.

In May 2001 Seybert, now represented by counsel, filed a workers' compensation claim, asking the board to set aside or modify the C & R based on misrepresentation and/or fraud. He also sought PTD benefits. After filing the request to set aside the C & R, Seybert subpoenaed a complete copy of the insurer's file on his claim, as well as any documents kept in the ordinary course of business identifying contacts with him by the insurance company or any of its representatives. Alaska National did not provide the complete file. It removed correspondence and notes related to communications between it and its attorney, claiming privilege. It also did not produce the reserve sheets or serious loss reports, which showed the carrier's potential liability on the claim.

Seybert moved to compel production of the parts of the file that had been withheld. The board held a hearing on May 16, 2002 on Seybert's petition to set aside the C & R and his discovery motion. Seybert and his daughter testified by telephone. Seybert testified that he had to pay for medical expenses out of pocket in Oregon and that this caused hardship to him. He testified that during the settlement negotiations, both Rudolph and McLaughlin told him that he did not need an attorney. He testified that he did not understand that he would be giving up his weekly compensation checks when he signed the agreement. He also testified that Rudolph told him he could not get medical care unless he signed the agreement. He said that no one discussed PTD benefits with him even though he told Rudolph that he did not think he was capable of working. He related that he was in a lot of pain and

became upset after he found out that McLaughlin had contacted Dr. Nevins.

Rudolph testified for Alaska National. She indicated that she was in no hurry to settle the claim and that she believed that Seybert was not entitled to another change of physician. She also testified about the circumstances of the development of Howden's vocational rehabilitation plan and the settlement negotiations.

At the end of the hearing the board denied Seybert's requests to compel discovery. It decided that it would not abrogate the attorney-client privilege because there was no compelling reason to do so. It refused to compel production of the reserve information because it found it was not relevant to its decision.

In its decision of May 31, 2002, the board denied Seybert's request to set aside the C & R. Using definitions of "duress" and "fraud" from prior board decisions, the board found that Seybert had failed to prove by a preponderance of the evidence that Alaska National engaged in fraud or misrepresentation in negotiating the C & R.[5] The board specifically determined that Seybert's claims that he did not understand the terms of the C & R and that McLaughlin had repeatedly contacted him at the time of the C & R were not credible. It also found "no credible, specific evidence of misrepresentation or fraud or duress by the employer to coerce the employee to sign the C & R." Finally, the board found that the employer's attorney and insurer owed no fiduciary duty to the employee.

Seybert asked for reconsideration; the board decided to reconsider for the limited purpose of looking at whether there is a fiduciary relationship between the insurer and a workers' compensation claimant. The board decided after argument that there is

no such fiduciary duty; it interpreted the Alaska Workers' Compensation Act as setting up an adversarial system to decide claims. The board therefore reasoned that the employee's interest is in conflict with the employer's; because the insurance contract is between the insurer and the employer, there can be no fiduciary relationship between the employee and the insurer. It therefore affirmed its earlier decision.

Seybert appealed to the superior court, where he asked the court to permit him to supplement or clarify his statement of points on appeal to include an explicit claim that the C & R should be set aside because no one informed him of his right to request a second independent medical evaluation (SIME).[6] He argued that because he testified at the hearing about the issue, it had been properly raised. Alaska National opposed the motion, arguing that the issue had not been properly raised before the board and that granting the motion would cause undue delay. After a hearing on the motion, the superior court stayed the appeal and remanded the case to the board so that Seybert could raise claims related to an SIME.

The board held another hearing on April 8, 2004, to consider the issues identified in the superior court's remand order. In its April 23, 2004 decision the board found that the right to an SIME had not been triggered because there was no dispute between the employer's and employee's physicians. It further found that Seybert had waived procedural, as well as substantive, rights when he signed the C & R and that one of the rights he waived was the right to an SIME. It took administrative notice that all injured workers were, at the time of Seybert's claim, mailed a copy of *Workers' Compensation and You*, a booklet containing a "condensed but comprehensive description of substantive and proce-

---

**5.** The standard of proof the board applies for setting aside a C & R is clear and convincing evidence. *Blanas v. Brower*, AWCB Decision No. 97–0252, at 14 (Dec. 9, 1997) (citing *Witt v. Watkins*, 579 P.2d 1065, 1067–68 (Alaska 1978)). But the board here determined that Seybert had not met even the lower standard of the preponderance of the evidence.

**6.** An SIME is a board-ordered medical evaluation by an independent physician selected from a list maintained by the board; the purpose of an SIME is to assist the board when there are differences of opinion between the parties' physicians. AS 23.30.095(k); 8 Alaska Administrative Code (AAC) 45.090 (2004); 8 AAC 45.092 (2007); *Syren v. Municipality of Anchorage*, 2006 WL 1075088, at *2 (Alaska Workers' Comp. Bd., April 20, 2006).

dural rights under the Alaska Workers' Compensation Act, including a description of SIMEs." The board found that the parties chose to proceed in a non-adversarial way rather than pursue their claims through the hearing process and that the 1995 board that approved the C & R "declined to order or instigate adversarial procedures." The board later denied Seybert's request for reconsideration of this decision.

The superior court affirmed the board's decisions in all respects. It agreed with the board that there was no dispute between "the two doctors" such that an SIME was necessary.[7] It further held that Seybert's March 2004 request for an SIME [8] was an attempt to create a dispute that did not exist previously and that *Dwight v. Humana Hospital Alaska*[9] did not require an explicit waiver of the right to an SIME in all cases and specifically did not require one in Seybert's case. It decided that there was substantial evidence in the record to support the board's finding that Seybert had not shown clear and convincing evidence of fraud, misrepresentation, or duress. It determined that while the insurer owed Seybert a duty of good faith, it did not have a special or fiduciary relationship with him. Finally, the superior court held that the board had not abused its discretion in failing to compel production of the documents Seybert requested. The court reasoned that because the board had determined that Seybert's claims of fraud were not credible, there was no reason to abrogate the attorney-client privilege. It also upheld the board's refusal to compel production of the serious loss reports and reserve sheets, finding them not relevant.

Seybert appeals the denial of his petition to set aside the C & R, as well as the board's refusal to compel discovery. Alaska National cross-appeals the superior court's order remanding the case to the board to consider the SIME issue.

## III. DISCUSSION

### A. Standard of Review

In a workers' compensation appeal from the superior court we independently review the board's decision.[10] We review questions of law that do not involve agency expertise using our independent judgment.[11] When using this standard we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy." [12] For questions of law involving agency expertise we apply the reasonable basis test and defer to the agency's interpretation if it is reasonable.[13] We review factual findings made by the board to determine whether they are supported by substantial evidence.[14] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [15] The board's discovery rulings are reviewed for an abuse of discretion.[16] The superior court's remand to the board is also reviewed for an abuse of discretion.[17] An abuse of discretion

7. The superior court opinion does not identify the doctors to whom it refers.

8. The 2004 SIME request was based on the differences of opinion between Drs. Fleming and Dapra.

9. *Dwight v. Humana Hosp. Alaska*, 876 P.2d 1114 (Alaska 1994).

10. *Dougan v. Aurora Elec. Inc.*, 50 P.3d 789, 793 (Alaska 2002).

11. *George Easley Co. v. Estate of Lindekugel*, 117 P.3d 734, 740 (Alaska 2005) (citing *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

12. *Id.* (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

13. *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 277 (Alaska 2003) (citing *O'Callaghan v. Rue*, 996 P.2d 88, 94 (Alaska 2000)).

14. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000) (citing *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997)).

15. *Id.* (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

16. *Dougan*, 50 P.3d at 793.

17. *See Sw. Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities*, 941 P.2d 166, 172 (Alaska 1997).

exists when we have a definite and firm conviction that a mistake has been made.[18]

### B. Alaska National Had No Fiduciary Relationship with Seybert.

Seybert contends that because he was unrepresented when the C & R was negotiated and signed, Alaska National had a special duty to him under 3 Alaska Administrative Code (AAC) 26.100. He maintains that Alaska National breached that duty by requiring him to travel to Seattle to attend the pain clinic at Virginia Mason and by failing to advise him of a variety of benefits that might be available to him. Relying on a case from Delaware,[19] Seybert also asserts that he was a third-party beneficiary to the insurance contract between Alaska National and Cominco, and as a third-party beneficiary, he had a special relationship with Alaska National. The board decided that because the Alaska Workers' Compensation Act creates an adversarial relationship between an insurer and a workers' compensation claimant, there was no fiduciary relationship between Seybert and Alaska National.

█ We have determined that a "fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence."[20] We have recognized a fiduciary relationship between business partners, between attorneys and their clients, and in relationships involving trusts.[21] We have also recognized that inherent in every insurance contract is a fiduciary relationship that gives rise to an implied covenant of good faith and fair dealing in execution of the contract.[22] We refused to recognize a fiduciary relationship between a contractor and the owner of a home, however, because fiduciary duties are reserved for relationships involving heightened levels of trust.[23]

█ The board correctly determined here that because the Alaska Workers' Compensation Act creates an adversarial system, and because Seybert's and Alaska National's interests were in conflict, there was no basis for a fiduciary relationship between Seybert and Alaska National. Although 3 AAC 26.100 imposes some duties on a workers' compensation insurer, it does not impose a fiduciary relationship.[24] The regulation requires an insurer to provide a claimant with "assistance that is reasonable" so an unrepresented claimant can "comply with the law and reasonable claims handling requirements."[25] It also prohibits an insurer from requiring a claimant to "travel unreasonably for medical care, rehabilitation services, or any other purpose."[26] These requirements do not impose duties of loyalty and the disavowal of self-interest that are hallmarks of a fiduciary's role.[27] The workers' compensation system is still an adversarial system, and a fiduciary relationship does not usually exist between opposing parties in an adversarial system.

Seybert argues that Alaska National violated the regulation by requiring him to travel to Seattle to attend a pain clinic. Seybert's attendance at the pain clinic and the travel it entailed happened months before the parties began serious settlement negotiations. His travel to Seattle does not appear to be relevant to the issue of contract formation and the validity of the C & R, and

**18.** *Dougan,* 50 P.3d at 793 (citing *Morgan v. State, Dep't of Revenue,* 813 P.2d 295, 297 n. 4 (Alaska 1991)).

**19.** *Pierce v. Int'l Ins. Co. of Ill.,* 671 A.2d 1361 (Del.1996).

**20.** *Munn v. Thornton,* 956 P.2d 1213, 1220 (Alaska 1998) (quoting *Paskvan v. Mesich,* 455 P.2d 229, 232 (Alaska 1969)).

**21.** *Id.*

**22.** *O.K. Lumber Co. v. Providence Wash. Ins. Co.,* 759 P.2d 523, 525 (Alaska 1988).

**23.** *Munn,* 956 P.2d at 1220.

**24.** 3 AAC 26.100 (2005).

**25.** 3 AAC 26.100(2) (2005).

**26.** 3 AAC 26.100(1) (2005).

**27.** *Munn,* 956 P.2d at 1220 (quoting *Wagner v. Key Bank of Alaska,* 846 P.2d 112, 116 (Alaska 1993)).

Seybert offered no argument or evidence that it in fact influenced his decision to enter into the C & R. The board and the superior court did not err in disregarding this rationale for setting aside the C & R.

■ Alaska National also did not have a fiduciary relationship with Seybert as a result of its insurance contract with Cominco. We have recognized that an insurance contract carries with it a fiduciary relationship between the insurer and the insured.[28] We have never recognized that a workers' compensation claimant is a third-party beneficiary to a workers' compensation insurance contract. Seybert's simple assertion that he is a third-party beneficiary to the contract does not adequately brief the issue, so we will not consider it.[29] However, even the Delaware Supreme Court, which held in *Pierce v. International Insurance Co. of Illinois* that a workers' compensation claimant is a third-party beneficiary to a workers' compensation insurance policy, refused to find a fiduciary relationship on the facts of that case.[30]

### C. The Board Did Not Violate AS 23.30.012 when It Approved the C & R.

Seybert contends that the board violated statutory and regulatory standards in approving the C & R. He specifically argues that the board violated former 8 AAC 45.160(a) because it failed to find by clear and convincing evidence that approval of the settlement would be in Seybert's best interests. He also argues that the board violated AS 23.30.012 by (1) not holding a hearing or requiring an impartial medical examination;

(2) approving a settlement that did not strictly comply with the provisions of the Alaska Workers' Compensation Act; and (3) approving a lump-sum settlement without a showing that the settlement was in Seybert's best interests.

■ (b) provides that an agreement about a claim:

shall be approved by the board only when the terms conform to the provisions of this chapter, and, if it involves or is likely to involve permanent disability, the board may require an impartial medical examination and a hearing in order to determine whether or not to approve the agreement.[ [31] ]

Seybert contends that, because the medical and vocational records showed that his claim was likely to involve permanent total disability, the board was required either to order an impartial medical examination or to hold a hearing. This contention has no merit. Although medical and vocational records available to the board suggested that Seybert's claim could involve permanent total disability,[32] the statutory provisions at that time were discretionary, not mandatory; the board could, in its discretion, decide not to hold a hearing or order a medical examination.[33]

■ Seybert also argues that the settlement did not strictly comply with the provisions of the Alaska Workers' Compensation Act in that the settlement did not contain an explicit waiver of his right to request an SIME. But because there was no disagreement between Seybert's treating physician,

---

**28.** *O.K. Lumber,* 759 P.2d at 525.

**29.** *Adamson v. Univ. of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").

**30.** *Pierce v. Int'l Ins. Co. of Ill.,* 671 A.2d 1361, 1365–66 (Del.1996). We also note that the Delaware court distinguished our case law from its decision in *Pierce* because we had determined that in Alaska a workers' compensation claimant who alleges bad faith on the part of the insurer has a cause of action in tort rather than contract. *Pierce,* 671 A.2d at 1367 (citing *Stafford v. Westchester Fire Ins. Co.,* 526 P.2d 37 (Alaska 1974),

*overruled on other grounds by Cooper v. Argonaut Ins. Cos.,* 556 P.2d 525 (Alaska 1976)).

**31.** AS 23.30.012(b).

**32.** Seybert's receipt of SSDI could, as counsel for Alaska National conceded at oral argument before us, support the notion that Seybert was permanently and totally disabled.

**33.** The 2005 amendments to the Alaska Workers' Compensation Act require the board to review settlements when the claimant is not represented by an attorney licensed in Alaska. Ch. 10, § 10, FSSLA 2005. We express no opinion about what this review should entail.

Dr. Fleming, and an employer's independent medical evaluation when the settlement was negotiated and signed, the board did not have to give Seybert explicit notice of his right to request an SIME, and Seybert did not have to waive the right explicitly.[34]

When the C & R was signed there may well have been a difference of opinion between Drs. Fleming and Williamson–Kirkland about Seybert's need for continuing treatment after the pain clinic. Dr. Fleming wrote in November 1994 that Seybert required continuing medical treatment, while Dr. Williamson–Kirkland apparently informed Alaska National in March 1994 that Seybert no longer needed medical care related to his work injury. But in 1994 and 1995 Dr. Williamson–Kirkland had not performed an independent medical evaluation for Alaska National; in fact, Seybert listed Dr. Williamson–Kirkland as an attending physician on his 1994 workers' compensation claim. Dr. Williamson–Kirkland only became an IME physician to Seybert in 2000, when he again examined Seybert at the request of Alaska National.

There may also have been a dispute about whether the reemployment plan obtained by Alaska National was appropriate, but there was no dispute between an IME and a treating physician about the plan.[35] Dr. Dapra's report cannot reasonably be read to express an opinion about Seybert's functional capacity to participate in Alaska National's reemployment plan because Dr. Dapra never examined Seybert after his second surgery, his completion of the pain clinic, and the development of the reemployment plan. Former AS 23.30.095(k) only applied if there was a dispute between an attending physician and an employer's independent medical evaluation.[36]

 Seybert also maintains that the board abused its discretion in approving a lump-sum award. At all times relevant here, former AS 23.30.012 provided, "The board may approve lump-sum settlements when it appears to be in the best interest of the employee or beneficiary or beneficiaries."[37] Seybert relies on cases from other jurisdictions, which he claims show a general rule that lump-sum settlements are disfavored. The cases Seybert relies on are distinguishable because they deal with commutations of ongoing awards to lump-sum awards rather than the settlement of claims.[38] As Larson notes, commutation of an award is distinct from compromise of a claim.[39] Here, the money Seybert received was the result of a compromise of his claim, not the commutation of an award into a lump sum.[40]

---

**34.** *Dwight v. Humana Hosp. Alaska,* 876 P.2d 1114, 1119 (Alaska 1994) (holding that board is required to give parties notice of right to request SIME in event of medical dispute). Here there was no medical dispute as defined in former AS 23.30.095(k).

**35.** Former AS 23.30.095(k) (providing for SIME in event of medical dispute regarding ability to enter reemployment plan).

**36.** *Id.*

**37.** The current statute provides, "A lump-sum settlement may be approved when it appears to be to the best interest of the employee or beneficiary or beneficiaries." AS 23.30.012(b).

**38.** *Dameron v. Neumann Bros.,* 339 N.W.2d 160, 161 (Iowa 1983) (after employee was awarded weekly PTD benefits, he applied to have them commuted to lump-sum award; commutation was permitted as being in employee's best interest); *Codling v. Aztec Well Servicing Co.,* 89 N.M. 213, 549 P.2d 628, 632 (App.1976) (reversing lump-sum commutation of PPI award where insufficient evidence supported exceptional circumstances to justify commutation); *Bailey v. Colonial Freight Sys., Inc.,* 836 S.W.2d 554, 557 (Tenn.1992) (trial court must consider whether commutation of award is in employee's best interests as well as employee's ability to manage his money).

**39.** 8 Arthur Larson & Lex K. Larson, Workers' Compensation Law § 132.07[1] (2007). AS 23.30.160 prohibits commutations of compensation or benefits except as provided in the worker's compensation act. PPI benefits can be paid as a lump sum in some circumstances under AS 23.30.190(a), and AS 23.30.215(d) permits commutation of an award payable to an alien dependent.

**40.** For this same reason, Seybert's claim that the settlement was presumptively unreasonable under former 8 AAC 45.160(e) has no merit. 8 AAC 45.160(e) provided that lump-sum settlements of *board-ordered* PTD claims were presumed unreasonable. There was never a board-ordered PTD claim in Seybert's case.

■ Seybert's argument that the board could not approve the settlement absent a finding by clear and convincing evidence that the settlement was in his best interests is also unpersuasive. Former 8 AAC 45.160(a) provided as follows:

> The board will review settlement agreements which provide for the payment of compensation due or to become due and which undertake to release the employer from any or all future liability. Settlement agreements will be approved by the board only where a dispute exists concerning the rights of the parties or where clear and convincing evidence demonstrates that approval would be for the best interests of the employee or his beneficiaries.

Here, the parties disagreed, at a minimum, about the reemployment plan that Alaska National proposed. Because a dispute existed about the rights of the parties, the board did not need to find by clear and convincing evidence that approval would be in Seybert's best interests.

### D. The Board Used an Incorrect Legal Standard in Evaluating Seybert's Misrepresentation Claim.

The central issue in Seybert's appeal is his assertion that the board erred in evaluating his claim that the C & R should be set aside because of fraud, misrepresentation, or duress. Seybert outlines the legal standards from our cases about contract formation to argue that the board erred in determining that there was no evidence of fraud or misrepresentation. He asserts that even if some of Rudolph's statements were non-fraudulent misrepresentations, her statements were nonetheless material misrepresentations, that he justifiably relied on them, and that as a result, the C & R should be set aside. Alaska National contends that the legal standard

for fraud that the board used is "virtually identical" to the elements set out in *Industrial Commercial Electric, Inc. v. McLees* for voiding a contract for fraud.[41]

The board applied the following standard in evaluating Seybert's assertion that Alaska National had committed fraud in negotiating the contract: "We have determined 'fraud' in the context of a C & R to be intentional misrepresentation, which induces the employee to sign the C & R in reliance on that misrepresentation." It found "no credible, specific evidence of misrepresentation or fraud or duress by the employer to coerce [Seybert] to sign the C & R." The board made no other specific findings related to Seybert's fraud claim and did not articulate or apply a separate standard for misrepresentation. Because the board looked at whether there was an intentional misrepresentation in its definition of fraud, we assume that the board analyzed any claim of misrepresentation as part of Seybert's fraud claim.

■ We have previously determined that a workers' compensation C & R is a contract and is subject to interpretation as any other contract.[42] Standards of contract formation from our common law therefore apply to formation and rescission of workers' compensation settlement contracts to the extent these standards are not overridden by statute.[43] Thus, even though a personal injury settlement agreement may be set aside for mistake,[44] we have held that the workers' compensation act does not permit avoidance of a settlement contract based on mistakes of fact.[45] We have also held, however, that the board can set aside a settlement agreement based on fraud,[46] and the board has interpreted the Alaska Workers' Compensation Act as giving it the authority to set aside a settlement agreement on other bases as

**41.** *Indus. Commercial Elec., Inc. v. McLees,* 101 P.3d 593 (Alaska 2004).

**42.** *Williams v. Abood,* 53 P.3d 134, 139 (Alaska 2002).

**43.** *See Walton v. Ramos Aasand & Co.,* 963 P.2d 1042, 1045 (Alaska 1998) (holding that basic contract-law principles of contract formation apply to settlement agreements); *Olsen Logging Co. v. Lawson,* 856 P.2d 1155, 1158–59 (Alaska 1993)

(holding that AS 23.30.012 prohibits setting aside workers' compensation C & R based on mistake).

**44.** *Witt v. Watkins,* 579 P.2d 1065, 1067 (Alaska 1978).

**45.** *Olsen Logging Co.,* 856 P.2d at 1158–59.

**46.** *Blanas v. Brower Co.,* 938 P.2d 1056, 1061–62 (Alaska 1997).

well.[47] Alaska National does not challenge the board's authority to set aside a C & R because of constructive fraud, duress, or misrepresentation; it argues only that the board correctly found that there was no evidence of any wrongful behavior by Alaska National.

 In order to sue in tort for damages related to misrepresentation, an injured party must establish the elements of fraudulent misrepresentation.[48] For purposes of avoiding or reforming a contract, however, a misrepresentation need not be fraudulent; it need only be material.[49] As we said in *McLees*, "Restatement (Second) of Contracts § 164 (1981) states that a contract is voidable '[i]f a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying.' "[50] The standard the board used to evaluate Seybert's claim of misrepresentation therefore differed in one significant way from that discussed in *McLees:* the board only looked to see if there was an *intentional* misrepresentation, not a *material* misrepresentation.[51] In order to avoid a contract based on a misrepresentation, the party seeking to avoid the contract must show (1) a misrepresentation; (2) which was fraudulent *or* material; (3) which induced the party to enter the contract; (4) upon which the party was justified in relying.[52]

 Although we agree that substantial evidence supports the board's finding that there was no intentional misrepresentation, it was error to consider only whether there was a fraudulent misrepresentation, and we cannot say that the error was harmless. There are at least two ways in which Rudolph's December 2, 1994 letter could have been materially misleading.

First, Rudolph stated, "At this point in your claim, there are three remaining benefits available." She then identified three "areas" of benefits: reemployment benefits, permanent partial impairment benefits, and medical benefits. From this statement Seybert could infer that he was potentially eligible for only these three benefits and no others, i.e., that no others were "remaining."[53] Rudolph did not tell Seybert that the disability benefits available to him, and which he would be waiving, could include PTD benefits, even though she knew as of September 26, 1994, that Seybert had been found eligible for SSDI benefits.[54] Counsel for Alaska National conceded at oral argument before us that Seybert's receipt of SSDI benefits could support the notion that Seybert might have been eligible for PTD benefits. Seybert argues that Rudolph's failure to mention subsection .041(k) benefits as part of the available reemployment benefits

**47.** *Smith v. Commonwealth Elec. Co.*, AWCB Decision No. 94–0141 (June 16, 1994).

**48.** *See Thomson v. Wheeler Constr. Co.*, 385 P.2d 111, 113 (Alaska 1963) (noting that defrauded party to contract has option of seeking damages based on fraudulent misrepresentation); *see also* Joseph M. Perillo, 7 Corbin on Contracts § 28.13, at 71–72 (rev. ed.2002); *compare* Restatement (Second) of Contracts § 164 (1981) *with* Restatement (Second) of Torts §§ 525, 526, 538 (1977). The elements of fraudulent misrepresentation include a false representation of fact, scienter, intention to induce reliance, justifiable reliance, and damages. *Barber v. Nat'l Bank of Alaska*, 815 P.2d 857, 862 (Alaska 1991) (citing Restatement (Second) of Torts § 525 (1976)).

**49.** *McLees*, 101 P.3d at 598 (citing *Cousineau v. Walker*, 613 P.2d 608, 612 (Alaska 1980)).

**50.** *Id.*

**51.** The board may also have required Seybert to show coercion as part of his misrepresentation and fraud claims, because its finding states, "[W]e find no credible, specific evidence of misrepresentation or fraud or duress by the employer to coerce the employee to sign the C & R." Coercion is not an element of fraud or misrepresentation, only duress. *Barber*, 815 P.2d at 862; *Helstrom v. N. Slope Borough*, 797 P.2d 1192, 1197 (Alaska 1990) (setting out elements of duress).

**52.** *Bering Straits Native Corp. v. Birklid*, 739 P.2d 767, 768 (Alaska 1987) (citing *Johnson v. Curran*, 633 P.2d 994, 997 (Alaska 1981)).

**53.** *See* Restatement (Second) of Contracts § 159 cmt. a (1981) (noting that meaning of statement depends on all the circumstances, including what may fairly be inferred from them).

**54.** To be found eligible for social security disability benefits, a claimant must show that based on his functional limitations, age, education, and past work history, he is unable to engage in substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A) (2004).

was also a material misrepresentation. The settlement waived entitlement to subsection .041(k) benefits; those benefits were not discussed with Seybert before settlement. Rudolph had calculated six weeks before she wrote Seybert that those benefits were worth approximately $25,000 for one year.[55] The board could therefore reasonably find that Rudolph's statement about the benefits remaining in Seybert's claim was not in accord with the facts she knew of his case.[56]

Second, Rudolph's statement in the letter concerning Seybert's right to change physicians is potentially materially misleading. Her December 2, 1994 letter acknowledged that Seybert was "entitled to further medical care as the result of [his] injury." It then stated, "Because of your recent move to Oregon, and as a term of our settlement proposal, we will agree to allow you to select a new physician in your local area and we will then be responsible for further medical care in accordance with the Alaska Workers' Compensation statutes." But this letter is unclear as to whether Alaska National acknowledged that Seybert had a right to a new physician because of his move to Oregon or Dr. Fleming's refusal to treat him, both of which events were independent of the settlement agreement.[57] And the December 27 letter implied that Alaska National's willingness to allow him to see a new physician depended on whether he settled his claims.

Seybert's arguments concerning the change of physicians focus on his contention that his treatment by Dr. Fleming was a referral within the meaning of AS 23.30.095(a).[58] The board did not discuss in detail Seybert's contention that the change in physicians from Dr. Rich to Dr. Fleming was a "referral" permitted by AS 23.30.095(a); it simply stated in its summary of the case that Dr. Rich referred Seybert to Dr. Fleming for a second opinion. The board may also consider on remand whether Seybert came under Dr. Fleming's care because of a referral. Depending on whether there was a referral, Rudolph's statements that Seybert had used his statutorily permitted change in physicians could have been materially misleading. In addition, the board should consider whether Seybert had a right, not subject to Alaska National's permission, to change physicians when the C & R was negotiated by virtue of either his move to Oregon or Dr. Fleming's refusal to treat him further.[59]

Because the question whether a misrepresentation is material is a mixed question of law and fact,[60] we must remand so the board can determine whether any of Rudolph's or Alaska National's statements were material misrepresentations. We also remand for consideration of the other elements of misrepresentation.[61] On remand, the board

---

**55.** A worker can receive subsection .041(k) benefits for up to two years from the date of plan approval. AS 23.30.041(k).

**56.** *See* RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981).

**57.** Rudolph's notes show that Dr. Fleming's office felt in March 1994 that there was nothing her office could do for Seybert because his problems were not neurosurgical. Dr. Fleming also clearly stated in her November 3, 1994 letter to Alaska National that she would not prescribe medication for Seybert because of his move to Oregon and that it was not in his interest to have her treat him because of the distance between his new home and Reno. The record does not explain why Alaska National paid for Seybert to visit Dr. Fleming in November 1994.

**58.** AS 23.30.095(a) provides, in part:
 When medical care is required, the injured employee may designate a licensed physician to provide all medical and related benefits. The employee may not make more than one

change in the employee's choice of attending physician without the written consent of the employer. Referral to a specialist by the employee's attending physician is not considered a change in physicians.

**59.** *See Bloom v. Tekton, Inc.,* 5 P.3d 235, 239 (Alaska 2000) (noting that when worker's attending physician becomes unwilling or unable to continue care, concerns over doctor shopping cannot override statute's primary purpose of allowing injured workers to choose their attending physicians); *see also Clymer v. Wilton Adjustment Servs.,* AWCB Decision No. 95–0068 (March 19, 1995); *Williams v. Cal Worthington Ford,* AWCB Decision No. 93–0254 (Oct. 13, 1993).

**60.** *Diblik v. Marcy,* 166 P.3d 23, 25 (Alaska 2007) (citing *Cousineau,* 613 P.2d at 613).

**61.** Seybert also argues that Alaska National's actions constituted constructive fraud, but the issue of constructive fraud in his case is encompassed in our ruling on the material misrepresentation

must consider whether any misrepresentation was an inducing cause—whether Seybert manifested his assent to the contract in reliance on them [62]—and whether Seybert was justified in relying on any misrepresentation. As to this latter issue, the board may need to consider whether the representations were statements of opinion and, if they were, whether Seybert reasonably believed that Rudolph had special skill or judgment with respect to the subject matter.[63]

Underlying the evaluation of Seybert's misrepresentation and fraud claims is the issue of what duty a workers' compensation insurance adjuster owes to an unrepresented claimant. Although we decide here that there is no fiduciary duty, the board may consider on remand what duty the adjuster does owe. Under certain circumstances nondisclosure of a fact can be equivalent to an assertion, and according to the Restatement (Second) of Contracts § 161(b), failure to act in good faith and in accordance with reasonable standards of fair dealing can be relevant in determining when non-disclosure of a fact is equivalent to an assertion.[64] Counsel for Alaska National stated at oral argument on appeal that an insurance adjuster has the duty to be honest with an unrepresented workers' compensation claimant, but insisted that Rudolph did not need to "put all [her] cards on the table" as a negotiating strategy. In workers' compensation, where there are complex rules that can carry significant consequences, it is hard to ignore the disparity in information and knowledge that an experienced insurance adjuster may possess compared with an unrepresented claimant. Be-

cause knowledge of the business practices of workers' compensation insurers is an area within the board's special expertise, the board should consider this question on remand. The issue of what the insurer's duties are to an unrepresented claimant may also be relevant in assessing whether Seybert was justified in relying on any misrepresentations Rudolph made.[65]

■■■ Seybert also argues that the board applied an incorrect legal standard to his claim of duress. Alaska National counters that the standard the board used is consistent with Alaska case law on duress. The standard the board applied in Seybert's case was "hardship intentionally created by overreaching or improper interference by the employer to coerce the employee to sign." We have held that a party alleging duress must show that (1) he involuntarily accepted the terms of another; (2) the circumstances permitted no alternative; and (3) such circumstances were the result of the coercive acts of the other party.[66] There appear to be some differences in the elements that must be shown under the two standards: the board's standard does not require a showing that the circumstances permitted no alternative, and it appears to require tortious conduct by the employer.[67] In contrast, we have held that the wrongful acts need only be "wrongful in the moral sense." [68]

Seybert argues that he presented evidence that satisfied the duress elements set out in *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.*,[69] but he does not show

issue. *See Adams v. Adams,* 89 P.3d 743, 750 (Alaska 2004) (comparing constructive fraud to misrepresentation).

**62.** RESTATEMENT (SECOND) OF CONTRACTS § 167 (1981).

**63.** *Id.* §§ 168–70.

**64.** *Id.* § 161(b); *see also id.* § 161 cmt. d (noting that party is expected to act in accordance with reasonable standards of fair dealing, as reflected in prevailing business ethics).

**65.** *Id.* §§ 169–70.

**66.** *Helstrom v. N. Slope Borough,* 797 P.2d 1192, 1197 (Alaska 1990) (quoting *Totem Marine Tug &*

Barge, Inc. v. Alyeska Pipeline Serv. Co., 584 P.2d 15, 21 (Alaska 1978)).

**67.** The board did not define "overreaching" or "improper interference" in its decision. We note that "overreaching" is defined as "taking unfair commercial advantage of another, especially by fraudulent means." BLACK'S LAW DICTIONARY 1136 (8th ed.2004). Improper interference, discussed in a somewhat different context—when it is claimed that there has been improper interference with a contract—is a tort. RESTATEMENT (SECOND) OF TORTS §§ 766–67 (1979).

**68.** *Totem Marine Tug & Barge,* 584 P.2d at 22.

**69.** *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 21 (Alaska 1978).

how differences between the board and court standards are material to his case. Absent a more detailed argument about how the standards differ and how the differences are important to his facts, and absent a meaningful discussion about why, in the context of workers' compensation claims, it was legal error for the board to use a standard that differs from the one we have discussed, we will not consider whether the board used an incorrect legal standard in evaluating Seybert's claim of duress.

Seybert's argument that the C & R should fail for lack of consideration has no merit. Even if the dispute about the change in physicians was not a bona fide dispute, Seybert received consideration, $30,000, for the release of his claims. Failure of part of the consideration Seybert received does not void the entire contract for lack of consideration.[70] We are also unpersuaded by Seybert's argument that the use of the term "primary physician" in the settlement agreement was ambiguous and misleading. In the settlement agreement Alaska National stated that Dr. Williamson–Kirkland was the "primary physician in connection with Mr. Seybert's pain clinic." This is an accurate statement. The agreement also said, "[T]he employer contends that the employee has had one (1) change of primary physician thus far in this claim.... [T]he employee will be allowed to make one (1) additional change of treating physician." Although the use of the terms "primary" and "treating" is inconsistent, it was not materially misleading.[71]

### E. The Board Did Not Err in Failing To Order an SIME.

Seybert argues that he never waived his right to request an SIME under former AS 23.30.095(k) and that the board erred in not ordering an SIME in 2004. Seybert requested an SIME in 2004 based on his assertion that a dispute existed in 1994 between his treating physician, Dr. Fleming, and the employer's physician, Dr. Dapra. The board refused to order an SIME, finding that there was no medical dispute requiring one and that Seybert had waived any right he had to one when he signed the C & R.

We affirm the board's refusal to order an SIME in 2004. Although there was a difference of opinion in 1993 between Drs. Fleming and Dapra about the need for a second surgery, Alaska National agreed to pay for the medical treatment proposed by Dr. Fleming, Seybert's treating physician. The purpose of an SIME is to have an independent expert provide an opinion to the board about a contested issue.[72] The board did not need its own expert in 2004 to resolve a dispute between the opinions of Drs. Fleming and Dapra because that dispute had been resolved in 1993 when Alaska National paid for Seybert's second surgery. The board correctly denied Seybert's 2004 request for an SIME related to the issues disputed in 1993.

### F. Discovery Rulings

Seybert subpoenaed Alaska National's file concerning his claim during pre-hearing discovery. Alaska National failed to produce the entire file; it claimed privilege with respect to any correspondence or telephone notes between its staff and its attorney. It also refused to produce the serious loss reports and reserve sheets prepared during the pendency of the claim; it asserted that these documents were proprietary and not relevant. Seybert asked the board to compel discovery of the withheld documents. The board refused to do so; it decided that the documents requested were either privileged or not material. With respect to the correspondence and records of telephone calls between Alaska National and its attorney, the superior court ruled that the board did not abuse its discretion because the board per-

The elements are the same in *Helstrom,* 797 P.2d at 1197.

**70.** RESTATEMENT (SECOND) OF CONTRACTS § 80 (1981).

**71.** Seybert argues separately that the C & R terms related to medical care were unconsciona-

ble. We do not need to decide this issue because of our decision on his misrepresentation claim.

**72.** *See Osborne Constr. Co. v. Jordan,* 904 P.2d 386, 389 n. 3 (Alaska 1995); *Dwight v. Humana Hosp. Alaska,* 876 P.2d 1114, 1119 (Alaska 1994).

missibly could have found that Seybert did not make a sufficient showing of fraud to justify overriding the attorney-client privilege. The superior court also held that even though the serious loss reports were not privileged, the board did not abuse its discretion in failing to order production of the documents because they were not material.

■ We agree with the superior court and the board that Seybert did not make a showing of fraud sufficient to overcome the attorney-client privilege. To override the attorney-client privilege, Seybert was required to make out a prima facie showing that Alaska National consulted with its attorney for the purpose of defrauding him.[73] To make out a prima facie case, he had to present more than mere allegations.[74] We hold that on these facts Seybert did not make out a prima facie case of civil fraud entitling him to discovery of privileged documents. The board consequently did not abuse its discretion by refusing to compel production of the documents.

■ With respect to the reserve sheets and serious loss reports, the board decided that they were not relevant. Cominco argues here that the serious loss reports and reserve worksheets are work product and are not discoverable or that they are unlikely to lead to the development or disclosure of relevant evidence. We have previously determined that attorney-client privilege and work product doctrine do not protect the existence and amount of loss reserves from discovery when they are relevant, absent some showing that the documents in question were prepared at the direction of an attorney.[75] Cominco did not make a showing before the board that the documents were in fact prepared at the direction of counsel. Because we remand the misrepresentation claim to the board for application of a different legal standard, the board may reexamine its ruling to decide whether the reserve sheets or serious loss reports might reasonably lead to the discovery of admissible evidence.

## IV. ALASKA NATIONAL'S CROSS-APPEAL

Alaska National cross-appeals the superior court's order remanding Seybert's case to the board while the superior court appeal was pending so the board could decide Seybert's claims "on the issue of a SIME as it relates to the settlement agreement." The superior court stayed the appeal during the remand to the board. Alaska National contends that remanding the case while the appeal was pending violates principles of claim splitting or res judicata and that the superior court therefore abused its discretion in remanding the case. Seybert counters that a remand to the board was within the power of the superior court under the appellate rules, as well as the Administrative Procedure Act, and that even if the superior court erred by remanding, the error was harmless.

■ Alaska National's claim that res judicata barred the superior court from remanding Seybert's case to the board fails because all of the proceedings were part of the same action. Although res judicata applies to workers' compensation proceedings, the doctrine is not applied as rigidly in administrative proceedings as it is in judicial proceedings.[76] Res judicata applies to subsequent lawsuits to bar relitigation of issues that could have been raised in a prior lawsuit.[77] Because the remand in Seybert's case was in the middle of the appeal of the decision, it was not a subsequent lawsuit. The cases on which Alaska National relies deal with litigation that ended in a final judgment, followed by a second lawsuit or administrative action based on the same set of facts as the first litigation.[78] None of the cases deals with a request for remand to an administrative agency during the course of an appeal to the superior court.

**73.** *Munn v. Bristol Bay Hous. Auth.*, 777 P.2d 188, 195 (Alaska 1989).

**74.** *United Servs. Auto. Ass'n v. Werley*, 526 P.2d 28, 32 (Alaska 1974).

**75.** *Loyal Order of Moose, Lodge 1392 v. Int'l Fid. Ins. Co.*, 797 P.2d 622, 628 n. 14 (Alaska 1990).

**76.** *Robertson v. Am. Mech., Inc.*, 54 P.3d 777, 779–80 (Alaska 2002) (citing *McKean v. Municipality of Anchorage*, 783 P.2d 1169, 1171 (Alaska 1989)).

**77.** *See State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 874 (Alaska 2003).

**78.** *Robertson*, 54 P.3d at 780 (worker's second compensation claim barred by res judicata be-

Appellate Rule 520(c) gives an appellate court discretion to "require such further proceedings to be had as may be just under the circumstances." [79] Alaska Statute 44.62.570 also gives the superior court the authority to supplement the agency record on appeal or remand a case to an administrative agency.[80] Here, Seybert presented some evidence at his first hearing that no one had informed him of his right to request an SIME, although he did not make an explicit legal argument related to the SIME issue at the first hearing.[81] In remanding the case to the board, the superior court ensured that both parties could present evidence to support their arguments and rebut the other party's arguments. It was within the power of the superior court to remand the case to the board for this purpose.

Moreover, Alaska National does not explain how it was harmed by the remand.[82] The superior court did not abuse its discretion in remanding the case to the board for further proceedings while the appeal was pending.

## V. CONCLUSION

Because the board used a standard that was too restrictive to determine whether the C & R should be set aside on Seybert's misrepresentation theory, we REVERSE the board's order denying his petition and REMAND to the board for further proceedings consistent with this opinion. We AFFIRM the superior court's decision to remand the case to the board for further proceedings while the appeal was pending.

BRYNER, Justice, not participating.

---

cause both claims had same core set of facts); *DeNardo v. State,* 740 P.2d 453, 454–55, 457 (Alaska 1987) (second lawsuit against state barred by res judicata); *Calhoun v. Greening,* 636 P.2d 69, 72 (Alaska 1981) (res judicata barred second motion for relief from judgment when first motion for relief from judgment was denied and no appeal was taken).

**79.** Alaska R.App. P. 520(c).

**80.** AS 44.62.570(d).

**81.** He argued that he "did not fully know what his rights were" when he signed the C & R.

**82.** *See Municipality of Anchorage v. Devon,* 124 P.3d 424, 432 (Alaska 2005) (citing *Dobos v. Ingersoll,* 9 P.3d 1020, 1024 (Alaska 2000) (noting that party alleging error has burden of showing prejudice)).