NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN MILTON, | ) | |
| | ) | Supreme Court No. S-14161 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 10-009 |
| | ) | |
| UIC CONSTRUCTION, ALASKA | ) | MEMORANDUM OPINION |
| INSURANCE GUARANTY | ) | AND JUDGMENT* |
| ASSOCIATION, and NORTHERN | ) | |
| ADJUSTERS, INC., | ) | No. 1466 – August 21, 2013 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission, Laurence Keyes, Chair.

Appearances: John Milton, pro se, Fairbanks, Appellant. David D. Floerchinger and Vicki A. Paddock, Russell, Wagg, Gabbert & Budzinski, Anchorage, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I.    INTRODUCTION

In October 1985 a worker claimed he had suffered a work injury eight months earlier. In August 1989 the worker, represented by counsel, entered into a settlement agreement with his former employer; in October the agreement was approved

---

\*    Entered under Alaska Appellate Rule 214.

by the Alaska Workers' Compensation Board. Beginning in March 2007 the worker filed a number of workers' compensation claims, asking that the 1989 agreement be set aside and seeking a variety of benefits. After a hearing the Board refused to set aside the 1989 agreement, denied other claims as waived under that agreement, and found the worker's current medical complaints were not related to the 1985 injury. The Alaska Workers' Compensation Appeals Commission affirmed the Board. The worker appeals the Commission's affirmance of the Board's refusal to set aside the agreement. Because the Commission correctly concluded that substantial evidence supports the Board's findings underlying its ruling, we affirm the Commission's decision.

## II.     FACTS AND PROCEEDINGS

John Milton worked for UIC Construction in Barrow in 1985. A medical chart note dated February 11, 1985 recorded a left eye problem because "a rock struck him in the eye [at] work" on February 9. Milton's eye was checked again on February 12; no other medical records from this time period are in the record. Milton last worked for UIC Construction on March 23.

In late April 1985 Milton saw a Veteran's Administration doctor in Madison, Wisconsin because of a "migraine" that had lasted for three weeks. According to the medical chart notes, Milton denied "recent or previous head injury." After a CT scan, Milton was diagnosed with a left chronic subdural hematoma, underwent two surgeries, and was hospitalized for 12 days.

Milton began seeing Ronald Martino, M.D., in October, 1985. Milton reported to Dr. Martino that on February 9 he had been injured in a work-related accident "when he fell and struck his head." Milton described gradually worsening headaches and memory loss followed by "weakness in his right arm"; he indicated that, despite undergoing surgery, he still had head pain. Dr. Martino thought Milton's injuries would prevent him from working.

On October 29 Milton completed a report of injury form describing a head injury from falling on February 9; UIC Construction subsequently paid Milton temporary total disability (TTD) benefits. In June 1986 Dr. Martino reported overall improvement in Milton's condition, with the exception of some amnesia. Dr. Martino wrote that the amnesia episodes "sounded suspiciously like alcohol blackouts" even though Milton denied alcohol use. Dr. Martino did not think Milton was medically stable at that time, noting that head injuries can take two years to heal, but he thought secondary gain might be an issue because of "recent increased complaints of memory deficits." In August 1986 Dr. Martino said that Milton could return to his usual work. Milton suffered a seizure in Dr. Martino's office in January 1987 and was admitted to the hospital that day. In February UIC Construction controverted all of Milton's benefits on the ground that no evidence related his medical problems to his February 9, 1985 injury.

In August 1989 Milton and UIC Construction entered into a compromise and release agreement (C & R) to resolve Milton's workers' compensation claim. Milton was represented by counsel. At that time Milton already had received approximately $47,000 in TTD benefits and $11,700 in medical payment benefits. The C & R set out the parties' contentions and the dispute being resolved. UIC Construction contended that: (1) Milton had a work-related eye injury on February 9, 1985 and was treated for that injury; (2) Dr. Martino attributed Milton's later problems to either the February 9, 1985 injury or to chronic alcohol and drug abuse; (3) Milton evidenced alcohol and drug abuse when he was injured in a 1988 motor vehicle accident; and (4) UIC Construction believed that none of Milton's current medical problems were related to the February 9, 1985 injury. Milton contended that: (1) his February 9, 1985 work injury was caused by falling from a ladder; (2) the drugs in his system when he was in the 1988 motor vehicle accident were prescribed by his doctor; and (3) his medical problems were related to his February 9, 1985 injury.

"[T]o resolve all issues raised" by the parties "except for continuing medical care relative to [Milton's] February 1985 work-related injury," the C & R required UIC Construction to: (1) pay Milton a $15,000 lump sum upon Board approval of the settlement; and (2) obtain an annuity to pay Milton $500 monthly for life, with the first payment on September 1, 1989, and an additional $7,500 lump sum on August 1, 1999. In return Milton released UIC Construction from any and all workers' compensation claims "which might be presently due [Milton] or which might become due at any time in the future." Milton agreed that he "specifically intend[ed] to release" UIC Construction from any and all workers' compensation claims other than medical benefits "relative to his February 1985 eye injury."

Milton signed the C & R on August 21, 1989, and the parties submitted it to the Board for approval on August 29. The Board refused approval, sending the parties a form letter explaining its rejection of the C & R. UIC Construction requested a hearing. The Board scheduled a hearing for October 10 and approved the C & R that day; Milton received the money and annuity payments he was due under its terms.

In October 2006 Milton began having increased neck pain, which he attributed to his 1985 injury. He "wrote down UIC [Construction] as [his] insurer" after being told he might need surgery. In November UIC Construction controverted "[m]edical treatment related to cervical spine" because no medical evidence connected Milton's neck problems to the 1985 injury.

Milton filed a workers' compensation claim in March 2007, seeking permanent total disability (PTD) benefits, medical and transportation costs, and penalties and interest based on unfair or frivolous controversion. UIC Construction filed an answer and a controversion denying the claim and raising numerous affirmative defenses, including the 1989 C & R. UIC Construction arranged an employer's independent medical evaluation for Milton with an orthopedic surgeon in April. In the

surgeon's opinion, Milton's neck condition was not work related but was "secondary to degenerative disc disease and arthritis."

UIC Construction deposed Milton in May 2007. Milton gave details about his 1985 work-related accident and his medical treatment. Milton agreed that he had been represented by counsel at the time of the settlement. Milton said he did not read the C & R before he signed it because "it never occurred to [him] to read it." Milton remembered going to a government office once with his attorney, but he could not remember anything else about whether there had been a hearing on the C & R.

In July 2007 UIC Construction submitted written questions to Dr. Martino. Dr. Martino said that in his opinion Milton was competent when he signed the settlement agreement in August 1989, and that the 1985 work-related accident was not a substantial factor in causing Milton's current neck condition.

Beginning in November 2008 Milton filed a series of additional workers' compensation claims seeking a variety of benefits. He also asked that the C & R be set aside because of (1) his medical condition at the time he signed the settlement[1] or (2) regulatory violations, duress, misrepresentation, and fraud. UIC Construction denied liability based on the C & R.

UIC Construction deposed Milton a second time in May 2009, focusing on his request to overturn the C & R. Milton claimed that the Board had failed to follow its regulations when it approved the C & R. He said that not all of his medical records were attached to the C & R and explained that he knew this because he looked in boxes at the Fairbanks workers' compensation office and found only about nine or ten pages. Milton said that he never talked to the adjuster or to UIC Construction's attorney during the

---

[1] Milton suffers from posttraumatic stress disorder (PTSD) related to his military service and began receiving military disability payments in the late 1980s or early 1990s.

settlement negotiations and that he talked to his own attorney only one time. Milton claimed his attorney told him he had to sign the C & R or UIC Construction's attorney would make a case that Milton was a drug addict and an alcoholic and he would get nothing. Milton also said that he did not actively participate in negotiating the settlement. He remembered going to only one hearing and insisted that he signed the C & R at that hearing. Milton remembered being at the hearing with his attorney and that Joe Thomas, whom he knew from the laborer's union, was there. He did not know any of the other people at the hearing.

In late 2009 the Board held a hearing on Milton's claims. Milton was the only witness who testified at the hearing, but the Board had depositions from several doctors, mostly concerning his neck and back complaints. The Board decided that the work accident was not a substantial factor in causing Milton's neck and back problems and therefore he was not entitled to compensation. The Board also refused to set aside the C & R. It decided, based on a preponderance of the evidence, that Milton failed to prove he was not competent when the C & R was signed. It also determined that Milton had not proved duress or misrepresentation because his allegations involved his own attorney's statements; he had never talked to the adjuster or UIC Construction's attorney.

The Board also refused to set aside the C & R on the basis of regulatory or statutory violations. Because an independent medical examination is discretionary under AS 23.30.012, it rejected Milton's claim that an examination should have been ordered before the settlement was approved. It also noted that at the time of the settlement, AS 23.30.095(k) required a second independent medical evaluation only if there was a dispute between an employer's physician and the treating physician, but that UIC Construction had no employer's physician at that time. The Board found substantial evidence in the record demonstrating that at the October 1989 hearing it had ensured all legal requirements had been met. It acknowledged that no tape of the hearing existed,

but noted that audio cassette tapes of hearings "are retained for seven years, recycled once and then destroyed." The Board found that a hearing had been held based on the initial rejection of the C & R, the notice of a scheduled hearing, and the subsequent approval of the C & R on the scheduled hearing date.

The Board distinguished Milton's case from *Smith v. CSK Auto, Inc.*,[2] noting that Smith had not been represented by counsel and had received only a $10,000 settlement. In contrast, Milton was represented by counsel at the time of the C & R and received lump-sum payments totaling $22,500 as well as a $500 monthly payment for life. The Board also differentiated *Smith* because a hearing was held in Milton's case and because "there is substantial evidence in the instant case the medical records were complete when the Board approved the C & R."

Milton appealed to the Commission. The Commission decided that substantial evidence in the record supported the Board's decisions that: (1) there was no factual or legal basis to set aside the C & R; and (2) Milton's February 1985 injury was not a substantial factor in causing his current problems.

Milton appealed the Commission's decision affirming the Board's refusal to set aside the C & R. The Board subsequently discovered a box of Milton's medical records that had not been made part of the record on appeal, and we remanded the case to the Commission for reconsideration in light of the newly discovered medical records. After receiving supplemental briefing from the parties, the Commission again affirmed

---

[2] 204 P.3d 1001, 1013 (Alaska 2009) (setting aside settlement agreement because Board failed to follow its own regulations about best interests of worker before approving settlement and held hearing in worker's absence).

the Board's decisions. Milton again appeals, challenging only the Commission's affirmance of the Board's refusal to set aside the C & R.[3]

## III. STANDARD OF REVIEW

In an appeal from the Workers' Compensation Appeals Commission, we review the Commission's decision.[4] We independently review the Commission's conclusion that substantial evidence in the record supports the Board's findings, which "requires us to independently review the record and the Board's factual findings."[5] "Substantial evidence to support factual findings is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "[6]

## IV. DISCUSSION

### A. The Commission Correctly Decided That Substantial Evidence In The Record Supported The Board's Decision That Milton Was Competent When He Signed The C & R.

It is not clear whether Milton contests the Commission's affirmance of the Board's finding that he was competent when he signed the C & R. Because Milton cites psychological testing in his brief and includes a psychological evaluation in his excerpt,

---

[3]     Milton supplemented his points on appeal to include a claim that the Board or UIC Construction violated 8 Alaska Administrative Code (AAC) 45.120(e), which deals with hearsay at Board hearings. Because he did not brief this issue and did not raise it below, it has been waived. *Wagner v. Stuckagain Heights*, 926 P.2d 456, 459 (Alaska 1996) (holding argument waived for failure to raise in superior court); *Adamson v. Univ. of Alaska*, 819 P.2d 886, 889 n.3 (Alaska 1991) (holding cursory statement of issue not sufficient to raise argument).

[4]     *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010) (citing *Barrington v. Alaska Commc'ns Sys. Grp., Inc.*, 198 P.3d 1122, 1125 (Alaska 2008)).

[5]     *Smith*, 204 P.3d at 1007 (Alaska 2009).

[6]     *Id.* (quoting *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000)).

we briefly discuss whether the Board's finding that Milton was competent to sign the C & R was supported by substantial evidence.

Milton asked the Board to set aside the C & R because he was not competent to sign it due to his PTSD and related medications. The Board rejected this claim, relying on Dr. Martino's opinion that Milton was competent when he signed the C & R. The Board also noted that Milton was represented by counsel and had acknowledged when he signed the C & R that he was not under the influence of intoxicants or alcohol.

Substantial evidence in the record supports the Board's finding of competence. Dr. Martino was Milton's treating physician when the C & R was signed, and Dr. Martino gave the opinion that Milton was competent and able to read and understand English at that time. Milton provided no evidence contradicting Dr. Martino's opinions. As the Board noted, this case is similar to *Williams v. Abood*,[7] in which we affirmed the Board's decision that a worker was competent when a C & R was signed.[8] Like Milton, the worker in *Williams* was represented by counsel; also like Milton, the worker's doctor testified that the worker was competent.[9]

The Commission correctly concluded that substantial evidence in the record supported the Board's finding that Milton was competent when he signed the C & R, and we affirm the Commission's decision on this issue.

---

[7] 53 P.3d 134 (Alaska 2002).

[8] *Id.* at 144.

[9] *Id.* (explaining that because there was no evidence of fraud or duress, there was no reason to set aside the C & R).

**B.    The Commission Correctly Decided That Substantial Evidence In The Record Supported The Board's Decision That The C & R Should Not Be Rescinded Because Of Fraud, Misrepresentation, Or Duress.**

A party to a workers' compensation C & R may seek to have it rescinded because of misrepresentation.[10]  To set aside a settlement because of misrepresentation, the party must prove four elements:  "(1) a misrepresentation; (2) which was fraudulent or material; (3) which induced the party to enter into the [settlement]; (4) upon which the party was justified in relying."[11]  Here, Milton showed none of the elements of misrepresentation.

Milton told the Board that his misrepresentation claim was based on the C & R's describing an eye injury rather than a head injury and its implication that his head injury was a result of alcohol and drug abuse.  He testified that the eye injury was not work related and UIC knew when it drafted the C & R that he needed no further medical treatment for his eye injury; he viewed the statement in the C & R that he was releasing UIC from future claims for medical care not related to the eye injury as misleading.  But Board regulations required that the C & R set out the dispute between the parties,[12] and the C & R described UIC Construction's position that, because contemporaneous medical records supported a claim of a work-related eye injury and not a work-related fall, and because Dr. Martino began noting in June 1986 that some of Milton's symptoms "sounded suspiciously like alcohol blackouts," Milton had not in fact

---

[10]    *Seybert v. Cominco Alaska Exploration*, 182 P.3d 1079, 1093-94 (Alaska 2008).

[11]    *Smith*, 204 P.3d at 1008 (quoting *Seybert*, 182 P.3d at 1094) (internal quotation marks omitted).

[12]    *See* former 8 AAC 45.160(c)(4) (1987) (requiring that settlement agreement "state in detail the parties' respective claims").

suffered a fall. Milton's complaint is misplaced; setting out a party's position in a settlement agreement is not a misrepresentation. And we also note that Milton's February 11, 1985 medical record reflects that he described his February 9, 1985 eye injury as work related, that no other contemporaneous medical records reflect a head injury from a work-related fall on February 9, 1985, and that both of these facts support UIC Construction's position.

According to Milton, his attorney used the possibility that UIC Construction would present evidence about Milton's drug and alcohol use to persuade him to enter into the settlement agreement. Statements by Milton's attorney cannot be the basis of a finding of misrepresentation by UIC Construction.[13] And even if Milton's attorney merely passed on to Milton statements made by UIC Construction, the record is clear that UIC Construction had good reason to believe Milton's drug and alcohol use was the cause of his medical problems and had a reasonable justification to defend Milton's workers' compensation claims on that basis.

Based on the foregoing, the Commission correctly determined that substantial evidence in the record supported the Board's conclusion that the C & R should not be set aside because of misrepresentation, and we affirm the Commission on this issue.

Milton also argued that the C & R should be set aside because of duress. He testified at the hearing that he was under duress because of his PTSD and because his attorney told him that if he did not sign the C & R, UIC Construction "would make the accident look like [he was] a drug addict and alcoholic and [he would not] get anything."

---

[13] *See Smith*, 204 P.3d at 1009 (noting that misrepresentation must be made by other party to contract).

We have not defined duress in the context of a workers' compensation settlement.[14] Here, the Board used the following definition of duress: "hardship intentionally created by overreaching or improper interference by the employer to coerce the employee to sign." In a contract case, we "held that a party alleging duress must show that (1) he involuntarily accepted the terms of another; (2) the circumstances permitted no alternative; and (3) such circumstances were the result of coercive acts of the other party."[15]

Milton produced no evidence satisfying either definition of duress. He based his duress claim on his own circumstances and on his own attorney's actions. There was no evidence that UIC Construction engaged in any coercive acts — it simply asserted its reasonable and good faith position. Milton's attorney's actions cannot be the basis of a claim of duress caused by UIC Construction.[16] The Commission therefore correctly decided that substantial evidence in the record supported the Board's decision that the C & R should not be set aside because of duress, and we affirm the Commission on this issue.

**C.     The Commission Correctly Determined That Substantial Evidence Supported The Board's Decision That The C & R Should Not Be Set Aside Because Of Statutory Or Regulatory Violations.**

Most of Milton's briefing before us focuses on whether the Board in fact held a hearing in October 1989 before it approved the C & R; and we interpret his

---

[14]     *See Seybert*, 182 P.3d at 1096-97 (showing differences between Board and court standards and refusing to decide whether Board standard was same).

[15]     *Id.* at 1096 (citing *Helstrom v. N. Slope Borough*, 797 P.2d 1192, 1197 (Alaska 1990)).

[16]     *See Smith*, 204 P.3d at 1009 (rejecting argument that attorney's threat of withdrawal constituted duress).

arguments as also contesting whether the Board correctly decided that it had followed all applicable statutory and regulatory requirements when it approved the C & R. UIC Construction responds that the Commission and the Board correctly decided this issue.

At the time of the C & R, AS 23.30.012 provided:

> At any time after . . . 30 days subsequent to the date of injury, the employer and the employee . . . have the right to reach an agreement in regard to a claim for injury . . . under this chapter in accordance with the applicable schedule in this chapter, but a memorandum of the agreement in a form prescribed by the board shall be filed with the board. Otherwise, the agreement is void for any purpose. . . . The agreement shall be approved by the board only when the terms conform to the provisions of this chapter and, if it involves or is likely to involve permanent disability, the board may require an impartial medical examination and a hearing in order to determine whether or not to approve the agreement. The board may approve lump-sum settlements when it appears to be in the best interest of the employee. . . .

The Board's settlement agreement regulation in effect at the time of the C & R provided:

> (a)    The board will review settlement agreements which provide for the payment of compensation due or to become due and which undertake to release the employer from any or all future liability. Settlement agreements will be approved by the board only where a dispute exists concerning the rights of the parties or where clear and convincing evidence demonstrates that approval would be for the best interests of the employee or [the employee's] beneficiaries.
>
> (b)    All settlement agreements must be submitted in writing to the board, must be signed by all parties to the action and their attorneys or representatives, if any, and must be accompanied by form 07-6117.
>
> (c)    Every agreed settlement must conform strictly to the requirements of AS 23.30.012 and, in addition, must

(1) be accompanied by all medical reports in the parties' possession, except that, if a medical summary has been filed, only those medical reports not listed on the summary must accompany the agreed-upon settlement;

(2) include a written statement showing the employee's age and occupation on the date of injury, whether and when the employee has returned to work, and the nature of employment;

(3) report full information concerning the employee's wages or earning capacity;

(4) state in detail the parties' respective claims;

(5) state the attorney's fee arrangement between the employee . . . and the attorney, including the total amount of fees to be paid;

(6) itemize in detail all compensation previously paid on the claim with specific dates, types, amounts, rates, and periods covered by all past payments; and

(7) contain other information the board will, in its discretion and from time to time, require.

(d) The board will inquire into the adequacy of all agreed settlements and will, in its discretion, set the matter for hearing to determine whether an agreement should be approved or disapproved. Agreed settlements between the employer and the employee . . . are not final until approved by the board.

(e) Agreed settlements in which the employee waives medical benefits or benefits during rehabilitation training are presumed unreasonable and will not be approved absent a showing that the waiver is in the employee's best interests. In addition, lump-sum settlements of board-ordered permanent total disability claims are presumed unreasonable

and will not be approved absent a showing that the lump-sum settlement is in the employee's best interests.[17]

In *Smith v. CSK Auto, Inc.*, we held that the Board erred in not setting aside a C & R that failed to meet regulatory requirements.[18]  But we agree with UIC Construction that Milton's case differs from *Smith*.  Milton did not seek to set aside the C & R for over 18 years; in contrast, Smith petitioned to set his settlement aside about two years after the Board approved it.[19]  Board regulations about settlement agreements changed between the time of Milton's C & R and Smith's — in 1989 8 AAC 45.160 did not prohibit approval of a settlement before medical stability, but by Smith's settlement 8 AAC 45.160(e) provided that waiving TTD or PTD before medical stability was presumed not to be in the employee's best interest.[20]  Smith received only $10,000 in his settlement,[21] whereas Milton has received more than $200,000 and continues to receive $500 monthly.  Finally, Milton remembered attending a hearing, while it was clear from the record in *Smith* that Smith was not present at the hearing to approve the settlement.[22]

Milton argues here that the Board did not hold a hearing on the C & R on October 10, 1989.  Milton signed the settlement agreement on August 21; he insists he signed at a hearing; he remembers attending only one hearing; he thus concludes the

---

[17]     Former 8 AAC 45.160(a)-(e) (1987).

[18]     204 P.3d at 1013.

[19]     *Id.* at 1005.

[20]     *Compare* former 8 AAC 45.160(e) (1987), *with* 8 AAC 45.160(e), *quoted in Smith*, 204 P.3d at 1011.  Milton said in his deposition that he was not medically stable when the settlement was signed.

[21]     *Smith*, 204 P.3d at 1012.

[22]     *Id.*

hearing took place on August 21 — not on October 10, the date of Board approval. But circumstantial evidence in the record is more than adequate to support the Board's finding that it held a hearing as scheduled on October 10.[23] The adjuster and the employer's attorney signed the C & R after Milton; if the C & R were signed at a hearing, Milton fails to offer an explanation why all parties did not sign at that time. Moreover, in August 1989 the Board noted a number of deficiencies when first rejecting the C & R, and its rejection letter has no indication the C & R had been previously considered at a hearing. Milton knew Joe Thomas and remembered seeing him at the hearing; Thomas was a member of the panel that approved the settlement. The Board approved the settlement on October 10, the scheduled hearing date. This is all evidence from which a reasonable mind could conclude that a hearing actually occurred on October 10.

Milton also maintains that the Board panel members "committed a fraudulent act." This appears to relate to his claim that there was no hearing in October 1989. But there is no evidence to support his fraud claim; the record shows the panel members approved the C & R in October 1989 after they "examined" it. Because there was sufficient evidence to support the finding that the Board held a hearing in October 1989, Milton's claim that the Board committed fraud is unsupported.

Milton also argued to the Board that not all medical reports and summaries had been filed with the Board, as required by 8 AAC 45.160, before the C & R was approved. In his initial appeal to us, Milton relied mainly on an alleged lack of a hearing to approve the C & R to argue that the C & R should be set aside. In Milton's statement

---

[23] Substantial evidence supporting an agency's factual finding can be circumstantial as well as direct. *Commercial Fisheries Entry Comm'n v. Baxter*, 806 P.2d 1373, 1375 (Alaska 1991) (citations omitted).

of points on appeal for the second appeal, he expressly stated that "the medical records [were] not the issue." We therefore do not address the medical records issue.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the Commission's decision.